Mark S. WEINBERGER, M.D., Mark Weinberger, M.D., P.C., Merrillville Center for Advanced Surgery, LLC and Nose and Sinus Center, LLC, Appellants–Defendants,

v.

William BOYER, Appellee–Plaintiff.

No. 45A03–1011–CT–598.

Court of Appeals of Indiana.

Oct. 19, 2011.

James L. Hough, Spangler Jennings & Dougherty, Merrillville, IN, Attorney for Appellants.

David J. Cutshaw, Gabriel A. Hawkins, Leslie B. Pollie, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants–Defendants, Mark S. Weinberger, M.D., (Weinberger), and Mark S. Weinberger, M.D., P.C. Merrillville Center for Advance Surgery, LLC, and Nose and Sinus Center, LLC. (collectively, the Weinberger Entities), appeal the jury's award of damages in the amount of $300,000 to Appellee–Plaintiff, William Boyer (Boyer), following Boyer's Complaint for medical malpractice.

We affirm.

### ISSUES

The Weinberger Entities raise nine issues on appeal, which we restate as:

(1) Whether the trial court abused its discretion when it denied the Weinberger Entities' motion for change of judge;

(2) Whether the trial court abused its discretion when it failed to strike two jurors for cause after they expressed a bias against the Weinberger Entities;

(3) Whether the trial court abused its discretion when it admitted testimony on Weinberger's breach of standard of care in Boyer's treatment after the Weinberger Entities had already admitted to this breach;

(4) Whether the trial court abused its discretion by admitting the result of Boyer's EKG;

(5) Whether the trial court abused its discretion when it allowed Boyer to present evidence of Weinberger's flight and absence from the country;

(6) Whether the trial court abused its discretion by admitting evidence of Weinberger's medical care for patients other than Boyer;

(7) Whether the trial court abused its discretion when it permitted Boyer to call the Weinberger Entities' expert witness in his case-in-chief;

(8) Whether the trial court erred by denying the Weinberger Entities' motion for judgment on the evidence; and

(9) Whether the jury award was excessive.

### FACTS AND PROCEDURAL HISTORY

On December 22, 2003, fifty-one year old Boyer sought treatment from Weinberger for recurring difficulties with congestion and breathing "through [his] nose." (Transcript p. 958). Thirty minutes after walking into Weinberger's office without a scheduled appointment, Boyer was examined by Weinberger. During this appointment, Weinberger made Boyer undergo a CT scan. Discussing the results of the CT scan with Boyer, Weinberger showed him a picture of sinus polyps and informed him that "these polyps [are] a serious problem. They're infected, they're bad, they can cause headaches, [and] can cause problems seeing." (Tr. p. 972). Weinberger recommended surgery as soon as possible. Boyer did not immediately agree to the suggested procedure.

Shortly after Boyer's initial visit, he received a letter from the Weinberger Entities, thanking him for placing his trust in Weinberger and offering "24–7" assistance from Weinberger's staff should he require it. (Tr. p. 975). Encouraged by the letter and tired of dealing with his breathing difficulties, Boyer decided to undergo the recommended sinus surgery, which was scheduled for January 15, 2004.

Sometime prior to surgery, Boyer had a blood test, an x-ray, and an EKG taken. The EKG revealed that Boyer had an ab-

normal heart reading; however, instead of disclosing this abnormality to Boyer, Weinberger crossed out "abnormal," wrote "normal," and initialed Boyer's EKG. (Appellees App. p. 2). Ninety minutes before surgery, Boyer was presented with a surgical consent form which informed Boyer of the risks associated with the surgery as well as alternatives thereto. The procedures performed during the surgery were listed on the operative report as follows:

1. Bilateral total endoscopic ethmoidectomy with stereotactic guidance.
2. Bilateral endoscopic maxillary antrostomy with stereotactic guidance.
3. Bilateral endoscopic sphenoidotomy with stereotactic guidance.
4. Septoplasty
5. Radiofrequency Palate Reduction
6. Bilateral Radiofrequency turbinate reduction
7. Image-guided endoscopic sinus surgery with Stryker navigation system.

(Appellants App. p. 196).

Following surgery, Boyer was prescribed medications to reduce congestion. After being weaned from these medications, Boyer's congestion became worse than it was prior to surgery. During a post-operative visit on January 22, 2004, Boyer complained to Weinberger about his continuing congestion problems. Weinberger noted that it could take up to six months after the surgery for a patient to improve and advised Boyer that post-operative scarring could become a problem. To resolve the potential post-operative scarring, Weinberger administered a post-operative debridement, whereby a rod is placed in a patients nose to remove scarring. Because this procedure was performed without any anesthetics, Boyer felt as if he was subjected to "medieval torture." (Tr. p. 1019). Weinberger administered similar debridements on January 29, 2004; February 19, 2004; March 4, 2004;

April 1, 2004; May 10, 2004; June 21, 2004; and September 16, 2004. After several months, Weinberger suggested a second surgery to solve Boyer's recurring congestion issues.

When Boyer visited Weinberger's office near the end of September 2004, the office was dark and empty with the exception of two women sitting at the front desk. One of the women informed Boyer that Weinberger was no longer available for visits and all surgeries were cancelled. Boyer was refused an explanation or a copy of his medical records.

In Weinberger's absence, Boyer sought substitute medical care with Dr. Dennis Han (Dr. Han). Dr. Han informed Boyer that the cause of his continued congestion was allergy-related rather than induced by his sinuses. A CT scan conducted by Dr. Han revealed that Weinberger had not performed the surgery consented to by Boyer but instead had "put holes in the maxillary sinus, poke[d] holes where they're not supposed to be" resulting in recirculation issues. (Tr. p. 374). To address these problems, Dr. Han suggested corrective surgery.

Eventually Boyer agreed to the revision surgery with Dr. Han. After Boyer was prepped for surgery and prior to operating, Dr. Han reviewed Boyer's EKG. Upon seeing the abnormal EKG, Dr. Han aborted the scheduled surgery and informed Boyer of his arrhythmia. Dr. Han recommended that Boyer see a cardiologist.

Meanwhile, it was discovered that in the weeks prior to Boyer's surgery of January 15, 2004, Weinberger began receiving large number of packages with camping materials. He also got numerous phone calls from banks inquiring about unusual activity on his accounts and credit cards. Almost five and a half years after Boyer found Weinberger's office dark and desert-

ed, Weinberger was apprehended in the Italian Alps.

On November 5, 2004, Boyer filed his proposed complaint for medical malpractice with the Indiana Department of Insurance. On March 27, 2009, the medical review panel issued a unanimous opinion, finding that Weinberger had failed to comply with the appropriate standard of care. Subsequently, on March 31, 2009, Boyer filed his Complaint for medical malpractice. On May 3, 2010, after filing an initial answer approximately a year earlier, the Weinberger Entities sought leave from the trial court to amend their answer and to admit negligence on the part of Weinberger. On June 29, 2010, the trial court issued an order indicating that

> the parties have resolved the issue raised by [the Weinberger Entities'] motion to amend answer. The parties have submitted a preliminary issues instruction which is approved by the [c]ourt and shall be read on the first morning of trial. The preliminary issues instruction shall define the issues for trial.

(Appellants' App. p. 84).

The jury trial was scheduled for August 23, 2010. Four days prior to the commencement of trial, the trial judge had a family emergency, making him unavailable to preside over the jury trial. That same day, the Chief Judge of the Lake Superior Court transferred the cause to another trial judge for trial over the Weinberger Entities' objection and request for a change of judge pursuant to Ind. Trial Rule 76. On August 23 through August 27, 2010, a jury trial was conducted. At the close of the evidence, the jury awarded Boyer damages in the amount of $300,000. Thereafter, on September 24, 2010, the Weinberger Entities filed a motion to correct error, which was denied by the trial court on October 27, 2010.

The Weinberger Entities now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Motion for Change of Judge*

First, the Weinberger Entities contend that the Chief Judge of the Lake Superior Court abused his discretion when he denied their motion for change of judge pursuant to Ind. Trial Rule 76. On August 18, 2010, five days prior to the scheduled trial date, the parties were notified that the original presiding trial judge was not available to preside over the jury trial due to a family emergency. That same day, the Chief Judge of the Lake Superior Court conferred with counsel from both parties and decided to transfer the matter to another trial judge who would be available to conduct the scheduled jury trial. The Weinberger Entities objected; the Chief Judge "heard the argument of counsel" and denied the motion, concluding:

> that the transfer is necessary for the efficient operation of the [c]ourt. This case has been set for trial for months and a continuance at this late date because of [the original trial judge's] family emergency is disruptive of the [c]ourt's calendar and the trial preparation of the parties. Moreover, a continuance is avoidable because [a trial judge] is available to hear this matter.

(Appellants' App. p. 22).

 A motion for a change of judge is governed by Indiana Trial Rule 76, which provides in pertinent part that

> (B) In civil actions, where a change may be taken from the judge, such change shall be granted upon the filing of an unverified application or motion without specifically stating the ground therefor by a party or his attorney. Provided,

however, a party shall be entitled to only one change from the judge.

* * *

(C) In any action except criminal no change of judge or change of venue from the county shall be granted except within the time period herein provided. Any such application for change of judge shall be filed not later than ten days after the issues are first closed on the merits.

Issues are first closed on the merits upon the filing of a defendant's original answer. *State ex rel. Prosser v. Lake Circuit Court,* 565 N.E.2d 751, 753 (Ind.1991). Thus, Indiana Trial Rule 76 provides that the granting of a motion to change judge is automatic if made within the time limitations established by the rule. We review a trial court's decision on a party's motion for change of judge for an abuse of discretion. *Mann v. Russell's Trailer Repair, Inc.,* 787 N.E.2d 922, 924–25 (Ind.Ct.App. 2003), *trans. denied.* An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id.*

Although the Weinberger Entities concede that their motion was not timely made, they maintain that because circumstances resulting in the change of judge did not emerge until five days prior to trial, it was impossible for them to object within the proscribed time limit. As they had not previously requested a change of judge, they insist to still be entitled to one automatic change of judge, regardless of the missed time limit.

▇ We disagree. The opportunity to file a motion for change of judge outside the ten day time limit is provided for in Ind. Trial Rule 76(C)(6), which states that if the moving party first obtains knowledge of the grounds for change of [ ] judge after the time above limited, he may file said application, which must be verified personally by the party himself, specifically alleging when the cause was first discovered, how discovered, the facts showing the grounds for a change, and why such cause could not have been discovered before by the exercise of due diligence.

The record reflects that the Weinberger Entities failed to file a verified application for change of judge, let alone, requested time to file one when informed by the Chief Judge that the cause would be transferred to another trial judge. Therefore, we conclude that the Chief Judge did not abuse his discretion when he denied the Weinberger Entities' motion for a change of judge.

## II. *Jury Selection*

During voir dire, the Weinberger Entities resorted to using two peremptory strikes to remove two jurors, who were perceived to be biased, from the venire. They now argue that because the trial court refused to dismiss both jurors for cause when requested by the Weinberger Entities, they had to use two of their three available peremptory strikes to remove the jurors and as such, "were effectively deprived of their right to use these challenges on other jurors who ultimately ended up being empaneled." (Appellants' Reply Br. p. 11).

▇ The trial court has discretion to grant or deny challenges for cause. *Merritt v. Evansville–Vanderburgh School Corp.,* 765 N.E.2d 1232, 1235 (Ind.2002). We will sustain the decision on appeal unless it is illogical or arbitrary. *Id.* However, when a juror serves who should have been removed for cause, the complaining party is entitled to a new trial, absent waiver. *Id.*

▇ Pursuant to Indiana's long-standing rule, a claim of error arising from the denial of a challenge for cause is waived unless the appellant used any remaining

peremptory challenges to remove the challenged juror or jurors. *Id.* As our supreme court stated in *Robinson v. State,* 453 N.E.2d 280, 282 (Ind.1983), "[o]ur law on this issue is well settled. We have consistently held that to preserve any error the defendant bears the burden of demonstrating that *at the time she challenged the jurors for cause,* she had exhausted her peremptory challenges." Eventual use of all peremptory challenges is therefore not enough to satisfy the exhaustion requirement. *Merritt,* 765 N.E.2d at 1235. The rationale for this approach is that "where a trial court may have erred in denying a party's challenge for cause, and the party can cure such error by peremptorily removing the apparently biased venire person, the party should do so in order to ensure a fair trial and an efficient resolution of the case." *Id.* To guide us through the field of venire challenges, our supreme court devised a clear and predictable road map:

> you must use any available peremptories to correct erroneous denials of challenges for cause. If on appeal you then prove both the erroneous denial and that you were unable to strike another objectionable juror because you exhausted your peremptories, you are entitled to a new trial, full stop.

*Id.* at 1237.

The exhaustion rule is fatal to the Weinberger Entities' claim. When the trial court denied their challenges for cause, the Weinberger Entities peremptorily struck the two jurors who were perceived to be biased. Had the Weinberger Entities already used all three peremptory strikes to remove jurors and then made a record of their desire and inability to strike these two jurors as well, their claim would have been available for an appellate

decision on the merits. They did not do so, and therefore, their claim is waived.

### III. *Testimony on Weinberger's Breach of Standard of Care*

Turning to the trial on the merits, the Weinberger Entities contend that the trial court abused its discretion by admitting Boyer's testimony with respect to Weinberger's breach of standard of care after the parties had agreed that an issue instruction be given to the jury in which the Weinberger Entities stipulated to the breach. Specifically, the Weinberger Entities assert that allowing this testimony only served to prejudice the jury and "to demonstrate 'what a bad guy' Weinberger was." (Appellants' App. p. 20).

The standard of review for admissibility of evidence is abuse of discretion.[1] *Blocher v. DeBartolo Properties Management, Inc.,* 760 N.E.2d 229, 233 (Ind.Ct.App.2001), *trans. denied.* The trial court abuses its discretion only when its action is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id.* Even when the trial court erred in its ruling on the admissibility of evidence, this court will reverse only if the error is inconsistent with substantial justice. *Id.*

The parties' stipulated issue instruction, tendered to the jury prior to trial and again at the conclusion of the evidence, reads as follows:

> The plaintiff, [Boyer], has brought this medical malpractice lawsuit against [the Weinberger Entities].
>
> In this lawsuit, [Boyer] claims that [Weinberger] owed him a duty of reasonable care in providing medical care to him and that he breached the appropri-

---

1. To avoid unnecessary repetitions of the standard of review, we note here that we will apply this same standard to the following four issues, all analyzing purported abuses of discretion in the admission of evidence.

ate standard of care by committing the following actions of malpractice, [Boyer] also claims that corporate defendants are vicariously responsible for the acts of malpractice committed by [Weinberger].

[Weinberger] failed to recommend non-surgical treatment for [Boyer's] symptoms, such as medicines or allergy testing, before recommending and performing sinus surgery on [Boyer].

[Weinberger] misread [Boyer's] X-rays which [Weinberger] used as a basis for negligently recommending surgery even though [Boyer] had no disease in his sinuses.

Because [Weinberger] failed to tell [Boyer] what his actual medical problems were and what he was actually going to do during surgery, [Weinberger] failed to get [Boyer's] informed consent to do surgery.

Because [Boyer] did not actually have sinus disease, there was no need to perform surgery on [Boyer] and [Weinberger] performed unnecessary surgery under general anesthesia.

[Weinberger] did not perform all of the procedures he told [Boyer] he was going to perform, but billed [Boyer] for the procedures.

[Weinberger] unnecessarily and improperly placed two maxillary antrostomies, or make two holes, in [Boyer's] maxillary sinuses where they are not supposed to be.

[Weinberger] failed to tell [Boyer] that he was departing the country and failed to arrange a referral to another physician for [Boyer's] subsequent care such that he abandoned [Boyer].

For the purposes of this civil lawsuit only, [the Weinberger Entities] have admitted that the appropriate standard of care has been breached. As to the specific claims of malpractice made by [Boyer], the Weinberger Entities will not present evidence contesting these specific claims of breaches of the standard of care against [Weinberger] and do not contest that the [Weinberger Entities] are vicariously responsible for [Weinberger's] action.

[Boyer] claims that the negligence of the [Weinberger Entities] caused him injuries and damages for which he seeks compensation. [Boyer] has the burden of proving that [the Weinberger Entities'] negligence caused injuries and damages by a preponderance of the evidence.

The [Weinberger Entities] deny that breaches of the standard of care caused the claimed injuries or damages of [Boyer]. The [Weinberger Entities] have no burden to disprove [Boyer's] claim.

(Tr. pp. 1305–1307).

 A judicial admission, as is before us, is an admission in a current pleading or made during the course of trial; it is conclusive upon the party making it and relieves the opposing party of the duty to present evidence on that issue. *Waugh v. Kelley*, 555 N.E.2d 857, 859 (Ind.Ct.App. 1990). Under this doctrine, an admission in a pleading is conclusive, and no evidence may be offered to contradict it. *Lutz v. Erie Ins. Exchange*, 848 N.E.2d 675, 678 (Ind.2006). Admissions are to be considered and weighed precisely as other evidence in the case by the trier of fact. *Id.* An admission's weight depends on its character, the circumstances under which it was made, and the effect of such circumstances is to be determined by the trier of fact. *Id.*

 Although the Weinberger Entities admitted to having breached the standard of care in certain instances of Boyer's treatment, Boyer nevertheless presented evidence at trial establishing this breach of care. A review of the record discloses that Boyer merely affirmed the admissions of

the Weinberger Entities; he never refuted or contradicted them.

Additionally, in the issue instruction the Weinberger Entities admitted only to a limited number of specified breaches in the standard of care, they emphatically denied the proximate cause element connecting their negligence to the damages alleged by Boyer. Therefore, to present a complete and comprehensive case to the jury, Boyer had to demonstrate the extent of Weinberger's tortious act and how this tortious act caused his injury.

 Moreover, we cannot say that this repetitive presentation of evidence amounted to prejudice. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger or unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Ind. Evid. R. 403. Admission of cumulative evidence alone is insufficient to warrant a new trial. *Fowler v. State*, 929 N.E.2d 875, 880 (Ind.Ct.App.2010), *trans. denied.*

Prior to the commencement of the jury trial, the jurors were read the issue instruction, informing them that Weinberger had performed unnecessary surgery on Boyer's healthy sinuses which he had billed to Boyer's insurance company; that instead of the agreed upon surgical procedures, Weinberger had poked holes in Boyer's sinuses; and that after failing to inform Boyer of his actual problems, Weinberger abandoned him. At the same time, during trial, the jurors heard testimony from the Weinberger Entities expert, describing Weinberger as "a disgrace to the medical profession." (Tr. p. 533). Because of this evidence, the repetition at trial of evidence establishing the specific breaches of care as conceded by the Weinberger Entities did not unfairly prejudice the Weinberger Entities.

## IV. *Admission of Boyer's EKG*

Next, the Weinberger Entities contest the admission of Boyer's testimony that his cardiologist had told him that the EKG performed by Weinberger prior to the surgery was abnormal. The Weinberger Entities assert that this statement amounted to inadmissible hearsay pursuant to Evid. R. 802; and instead, Boyer should have called his cardiologist to testify to the abnormality of his EKG.

 However, we do not need to address the merits of the Weinberger Entities' argument. As pointed out by Boyer, the abnormal reading of his EKG was properly before the jury through the testimony of several expert witnesses. In particular, Dr. Jerry Barakos (Dr. Barakos) was allowed to testify, without objection, that "abnormal was crossed out, normal EKG is written in." (Tr. p. 883). He also confirmed that "it wouldn't surprise [him] that a guy like this [*i.e.*, Weinberger] would take an abnormal interpretation, cross out the word abnormal and write down normal so to get the guy into surgery and make money." (Tr. p. 884). Dr. Vincent Mokarry (Dr. Mokarry) testified, without objection, that "[t]here was an EKG that was performed preoperatively, it had an abnormal reading per the computer that appears to be crossed out and the indication then is that that is a normal EKG." (Tr. p. 601).

 Here, Boyer's statement merely confirmed what other experts had already testified to previously, *i.e.*, that his preoperative EKG was abnormal. Even though Boyer's statement, repeating what he had learned from his cardiologist, might have been inadmissible hearsay, the erroneous admission of inadmissible hearsay will not be cause for reversal where such evidence is merely cumulative in nature. *Coffey v. Wininger*, 156 Ind.App. 233, 296 N.E.2d

154, 158–59 (1973), *reh'g denied.* Therefore, we will not reverse the trial court.

## V. *Evidence on Weinberger's Flight and Absence*

The Weinberger Entities claim that the trial court abused its discretion by admitting testimony concerning Weinberger's odd behavior that preceded his absence from the country. They maintain they were prejudiced by the admission of extensive irrelevant material that was unrelated to any care or treatment rendered to Boyer.

At trial, Boyer introduced evidence of Weinberger's behavior prior to his flight mainly through the testimony of Janet Gadacz (Gadacz), Weinberger's patient liaison. In her testimony, Gadacz stated that a month before Weinberger disappeared, up to thirty to forty packages came into the office containing camping equipment. She also told the jury that six to eight visitors who did not speak English very well met with Weinberger. In addition, she testified that banks were calling the office to inquire about "unusual activity" in Weinberger's accounts. Through Gadacz's testimony, Boyer established that Weinberger was collecting the necessary cash and materials to flee the country, thereby abandoning Boyer.

We have previously held that a sudden trip can be characterized as flight and, although standing alone does not raise a presumption of guilt, it is competent to show consciousness of guilt. *Gash v. Kohm,* 476 N.E.2d 910, 915 (Ind.Ct.App. 1985), *reh'g denied, trans. denied.* In two other cases, we analogized a defendants disposition of property to flight and allowed a similar inference of consciousness of guilt. *See Harrod v. Bisson,* 48 Ind. App. 549, 93 N.E. 1093 (1911) (evidence of a physician transferring assets after a malpractice claim was filed against him); *Myers v. Moore,* 3 Ind.App. 226, 28 N.E.

724 (1891). Therefore, we find the testimony concerning Weinberger's odd behavior preceding his flight relevant evidence as it establishes an inference of consciousness of guilt.

Additionally, in support of their argument to exclude the evidence of flight, the Weinberger Entities focus on Weinberger's deposition which was read into evidence at trial. During Weinberger's deposition, Boyer asked him questions about Weinberger's disappearance of five and a half years and his subsequent apprehension in the Italian Alps. He was also questioned about allegations that he had converted some of his assets to diamonds. Weinberger responded to each question by invoking his Fifth Amendment privilege against self-incrimination. The Weinberger Entities now assert that it is impermissible to establish an entire case by simply calling the defendant to the stand, and having him assert his privilege against self-incrimination in front of the jury, thereby allowing the jury to make improper inferences of wrongdoing from his refusal to testify.

In *Gash,* we held that "[a]lthough the refusal to testify in a civil case cannot be used against the one asserting the privilege in a subsequent criminal proceeding, the privilege against self-incrimination does not prohibit the trier of fact in a civil case from drawing adverse inferences from a witness refusal to testify." *Gash,* 476 N.E.2d at 913. The Weinberger Entities' assertion that they are being penalized because Weinberger asserted his Fifth Amendment rights is incorrect. While the trier of fact is permitted to draw an adverse inference from Weinberger's refusal to testify, this does not necessarily equate to a specific inference to penalize the Weinberger Entities. A party could raise the Fifth Amendment for many different reasons, and the jury can draw many rea-

sonable inferences from the assertion of this right.

▇▇▇▇ Furthermore, despite the Weinberger Entities' assertion that this evidence of flight rises to the level of prejudice, we conclude otherwise. In its issue instruction read to the jury prior to trial, the jury was already exposed to the notion that Weinberger had failed to tell Boyer that he was departing the country and was abandoning his patient. The circumstances surrounding this departure and abandonment were further explained through Gadacz's testimony. Mindful of the issue instruction having been read prior to the start of trial, we cannot agree that the additional clarifying details surrounding Weinberger's flight only served to "vilify" Weinberger in front of the jury. (*See* Appellants Br. p. 25).[2]

## VI. *Evidence of Patients other than Boyer*

Continuing their allegations concerning the admission of evidence, the Weinberger Entities dispute the admission of testimony concerning improper care rendered by Weinberger to patients other than Boyer. Because these alleged malpractice claims of other patients are not probative to Boyer's damages, the Weinberger Entities claim that the evidence was irrelevant and improperly admitted as prior bad act evidence pursuant to Indiana Evidence Rule 404(b). In response, Boyer avers that the evidence that Weinberger poked holes in the healthy sinuses of other patients in a manner similar to Boyer's is indicative to establish routine practice in accordance with Indiana Evidence Rule 406. In addition, Boyer claims that this evidence is equally admissible under Indiana Evidence Rule 404(b) because it shows Weinberger's 'plan.'

The record reflects that Dr. James Stankiewicz (Stankiewicz) testified that Weinberger's procedure of poking "holes in the posterior fontanelle" had been employed on other patients. (Tr. p. 542). Dr. Han saw "over a hundred" of Weinberger's patients and informed the jury that, from his experience, virtually all patients were told that they were full of polyps and needed corrective surgery as soon as possible. (Tr. pp. 325, 330). Although a surgery was performed, Dr. Han stated that these patients "didn't appear to have had much, if any, sinus surgery[.]" (Tr. p. 331).

Evaluating Boyer's claim in light of this evidence, we note that Evid. R. 406 provides that

[e]vidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Habit evidence is generally defined as "[e]vidence of ones regular response to a repeated specific situation." BLACK'S LAW DICTIONARY 597 (8 ed.2004); *Carlson v. Warren*, 878 N.E.2d 844, 850 (Ind.Ct.App. 2007). Relevant evidence to this inquiry is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it

---

**2.** In a single sentence, the Weinberger Entities claim that the specific circumstances of Weinberger's flight are inadmissible as improper evidence of bad acts, pursuant to Evid. R. 404(b). In a similar vein, the Weinberger Entities assert that Gadacz's statements are based on hearsay and therefore inadmissible.

Because the Weinberger Entities deem these allegations only worthy of a single sentence and have not favored us with a cogent argument supported by legal authority and references to the record, their claims are waived for our review. *See* Ind. Appellate Rule 46(A)(8).

would be without the evidence." Evid. R. 401.

 Weinberger's procedure of poking holes in Boyer's sinuses was explicitly admitted in the issue instruction and read to the jury prior to trial.[3] As we ·stated above, because the Weinberger Entities denied the proximate cause element of the negligence claim, Boyer could establish at trial that Weinberger had poked holes in his sinuses in order to causally link Weinberger's tortious act to the extent of Boyer's damages. Therefore, because the Weinberger Entities had already admitted to the specific tortious act of poking holes in Boyer's healthy sinuses, there was no need to establish it by way of habit. In addition, evidence determining that Weinberger was in the habit of poking holes in the healthy sinuses of his patients is not dispositive to measure Boyer's damages and is irrelevant to the issue before us. Consequently, the evidence is not admissible pursuant to Evid. R. 406.

We reach a similar result with respect to our analysis under Evid. R. 404(b), which provides, in part

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

The rule is designed to prevent the jury from assessing a defendants present guilt on the basis of his past propensities. *Hicks v. State*, 690 N.E.2d 215, 218 (Ind. 1997). In response to the Weinberger En-

tities' claim that the evidence of patients other than Boyer is inadmissible under Evid R. 404(b), Boyer refers to the medical battery claim he asserted in his Complaint. In particular, he asserts that to determine "his medical battery claim, Boyer had to prove that Weinberger *knew* at the time he informed Boyer of the parameters of the surgery that he was not going to perform the surgery he explained to Boyer but was going to, instead, poke holes in Boyer's sinuses." (Appellee's Br. p. 28) (emphasis added). Although Boyer claims that this "knowledge" falls within the plan exception of the rule, we find it more properly characterized as an intent exception. Regardless of its final characterization, we recognize that no knowledge element is required to prove the charge of medical battery as we defined medical battery in *Van Sice v. Sentany*, 595 N.E.2d 264, 268 (Ind.Ct.App.1992), as a failure to obtain informed consent. Moreover, the Weinberger Entities explicitly conceded to all elements of the medical battery claim by their admission in the issue instruction.[4] Thus, there was no need to prove the absence of informed consent by reference to other patients. Therefore, as this evidence was irrelevant, it was not admissible.

 Nevertheless, errors in the admission of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. Ind. Trial Rule 61. In determining whether error in the introduction of evidence affected the defendants substantial rights, we must address the probable impact of the evidence upon the jury. *McClain v. State*, 675 N.E.2d 329,

3. Specifically, the issue instruction read: "[Weinberger] unnecessarily and improperly placed two maxillary antrostomies, or make two holes, in [Boyer's] maxillary sinuses where they are not supposed to be." (Tr. p. 1306).

4. The issue instruction read as:
Because [Weinberger] failed to tell [Boyer] what his actual medical problems were and what he was actually going to do during surgery, [Weinberger] failed to get [Boyer's] informed consent to do surgery.
(Tr. pp. 1305–1306).

331 (Ind.1996). Besides the off-hand, one-sentence comment that "the Weinberger Entities were severely prejudiced, and the jury verdict was more likely than not inflated because of this evidence," the Weinberger Entities fail to make an argument as to how the evidence affected their substantial rights. (Appellants' App. p. 23). As such, their argument is waived. *See* Ind. Appellate Rule 46(A)(8). Notwithstanding this waiver, we note that at the onset of the trial, the jury became informed of Weinberger's actions through the reading of the issue instruction. Near the end, the issue instruction contains the phrase "[f]or the purposes of this civil lawsuit only, . . ." from which the jury could make a reasonable inference that more civil lawsuits might be outstanding. (Tr. p. 1306). Therefore, as the jury was put on notice prior to trial by the Weinberger Entities' own admission, we cannot say that the brief references to other possible victims affected the Weinberger Entities' substantial rights and, therefore, the admission of evidence of patients other than Boyer was harmless.

## VII. *Expert Witness*

Next, the Weinberger Entities contend that the trial court abused its discretion when it allowed Boyer to call the Weinberger Entities' expert, Dr. Stankiewicz, during Boyer's case-in-chief. Boyer had deposed Dr. Stankiewicz prior to trial and subsequently used the deposition transcript at trial. The Weinberger Entities now assert that Boyer had not previously disclosed that he would present expert testimony from Dr. Stankiewicz. Moreover, the Weinberger Entities maintain that allowing a plaintiff to call an undisclosed defense expert witness in the plaintiff's case-in-chief gives a plaintiff an unfair advantage because it can frame the testimony of the witness for purposes of cross-examination.

First, we note that pursuant to Indiana Evidence Rule 611(a) the mode and order of interrogating witnesses and presenting evidence is within the reasonable control of the trial court. Furthermore, contrary to the Weinberger Entities' claim, Boyer disclosed in his preliminary witness list, filed November 5, 2009, that he might call "[a]ny and all witnesses identified by [the Weinberger Entities]." (Appellee's App. p. 7). Also, Boyer notified the Weinberger Entities in the June 14, 2010 final pretrial order that he intended to call "[a]ny and all witnesses listed by [the Weinberger Entities]." (Appellant's App. p. 77). Therefore, the Weinberger Entities were placed on notice prior to the trial court's deadline for disclosing witnesses. Moreover, after the trial court's deadline expired, the Weinberger Entities specifically moved to bar Boyer from presenting testimony of the Weinberger Entities' expert witnesses in Boyer's case-in-chief—most notably, the testimony of Dr. Stankiewicz. As such, we conclude that Dr. Stankiewicz was properly called in Boyer's case-in-chief.

## VIII. *Motion for Judgment on the Evidence*

The Weinberger Entities next dispute the trial court's refusal to grant its motion for judgment on the evidence. The standard of review for a challenge to a ruling on a motion for judgment on the evidence is the same as the standard governing the trial court in making its decision. *Carr v. Pearman,* 860 N.E.2d 863, 871 (Ind.Ct.App.2007), *trans. denied.* Judgment on the evidence is proper only where all or some of the issues are not supported by sufficient evidence. *Id.* The court looks only to the evidence and the reasonable inferences drawn most favorable to the nonmoving party, and the motion should be granted only where there is

no substantial evidence supporting an essential issue in the case. *Id.*

■ At the close of Boyer's case-in-chief, the Weinberger Entities moved for a judgment on the evidence with respect to Weinberger's abandonment of Boyer. The Weinberger Entities asserted that in order to successfully raise a claim for abandonment, Boyer had to present evidence that his abandonment occurred at a critical stage of the patient's treatment. Because 'patient abandonment' has not yet been addressed by Indiana courts, the Weinberger Entities focused on out-of-state case law characterizing 'a critical stage' as being in need of immediate medical care at the time of the alleged abandonment. *See, e.g., Carroll v. Griffin,* 96 Ga.App. 826, 101 S.E.2d 764, 766 (1958). In response, Boyer averred that Weinberger's abandonment exacerbated his anguish arising from Weinberger's malpractice rather than constituted an independent tort. Specifically, Boyer stated:

This is a medical malpractice case, it's a breach on standard of care for abandoning a patient. We have alleged it from day one in our submission that he abandoned [Boyer] postoperatively.

(Tr. p. 1146).

Reviewing the record, we note that the trial court instructed the jury on Boyer's "medical malpractice suit against [the Weinberger Entities]," defining medical malpractice as

[a]n act of malpractice [is committed] when the health care provider fails to exercise the degree of reasonable care

and skill in providing health care to a patient as would a reasonably careful, skillful and prudent health care provider acting under the same or similar circumstances. The malpractice may consist of doing something that the health care provider should not have done under the circumstances, or the failure to do something that the health care provider should have done under the circumstances.

(Tr. pp. 1305, 1319). In this regard, the Weinberger Entities admitted in their issue instruction read to the jury that

In this lawsuit, [Boyer] claims that [Weinberger] owed him a duty of reasonable care in providing medical care to him and that he breached the appropriate standard of care by committing the following acts of medical malpractice ... [Weinberger] failed to tell [Boyer] that he was departing the country and failed to arrange a referral to another physician for [Boyer's] subsequent case such that he abandoned [Boyer].

(Tr. pp. 1305, 1306). The trial court did not instruct the jury that abandonment constituted an independent tort upon which liability could be predicated.

Viewing the jury instructions in their totality, the Weinberger Entities conceded that Weinberger's abandonment of Boyer should be evaluated in light of Weinberger's standard of care in the medical malpractice suit, *i.e.,* something that he should not have done under the circumstances, and not as an independent tort claim.[5] As only a claim for medical mal-

5. While we concur that a claim for patient abandonment has not previously been decided upon by an Indiana appellate tribunal, several of our sister states have already had the opportunity to elaborate on the elements of such contention. We find particularly persuasive the recent opinion in *Melton v. Medtronic, Inc.,* 389 S.C. 641, 698 S.E.2d 886, 893 (S.C.Ct.App.2010) in which the South Car-

olina Court of Appeals, relying on an earlier South Carolina Supreme Court decision, opined that it saw little need to recognize an additional cause of action related to tortious injuries arising out of interactions with medical providers when the tort of medical malpractice covers all acts performed in relation to medical services.

practice was made and no separate tort claim for patient abandonment was raised, the Weinberger Entities' motion for judgment on the evidence was not directed at a critical or essential element of the medical malpractice claim but rather at an underlying issue with respect to the standard of care. Therefore, the trial court properly denied the Weinberger Entities' motion.

### IX. *Excessive Jury Verdict*

In a final argument, the Weinberger Entities take issue with the amount of the jury verdict, characterizing it as "clearly excessive in light of the evidence presented." (Appellants Br. p. 28). While the Weinberger Entities acknowledge that Boyer incurred some minimal medical expenses, they contend that any damages awarded under the guise of emotional damages for pain and suffering are too high compared with other published damage awards. Thus, because of the relatively high verdict in light of the limited incurred expenses, they maintain that the verdict was motivated by passion or prejudice and that the evidence does not support the large award of $300,000.

Broadly stated, the person injured by the negligence of another is entitled to reasonable compensation. *Ritter v. Stanton*, 745 N.E.2d 828, 843 (Ind.Ct.App. 2001), *trans. denied.* "Reasonable compensation" refers to an amount that would reasonably compensate the plaintiff for bodily injury and for pain and suffering. *Id.* It also takes into account past, present, and future expenses reasonably necessary to the plaintiff's treatment and all financial losses suffered, or to be suffered, as a result of the inability to engage in his or her usual occupation. *Id.*

When reviewing a jury verdict containing a damage award claimed to be excessive or inadequate, we consider only the evidence that supports the award together with the reasonable inferences therefrom. *Id.* If there is any evidence to support the amount of the award, even if it is conflicting, this court will not reverse. *Id.* "A jury determination of damages is entitled to great deference when challenged on appeal." *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 462 (Ind. 2001).

This discretion is not limitless, however. We will set aside an award of compensatory damages as impermissibly excessive where it is apparent from a review of the evidence that the amount of damages is so great it cannot be explained upon any basis other than passion, partiality, prejudice, corruption, or some other improper element. *Ritter*, 745 N.E.2d at 843–44. To warrant reversal, the award must appear to be so outrageous as to impress the court at first blush with its enormity. *Id.* Still, the jury's damage award will not be deemed the result of improper considerations if the size of the award can be explained on any reasonable ground. *Id.* Further, when the evidence concerning the jury and damages is conflicting the jury is in the best position to assess the damages and the jury's verdict cannot be said to be based upon prejudice, passion, partiality, corruption, or in the consideration of some improper element. *Id.* Our supreme court has summarized this standard as follows:

> A personal injury award is not excessive where (1) the award was not based upon jury prejudice, partiality, or corruption, (2) the jury has not misunderstood or applied the evidence, (3) the award was not based upon consideration of an improper element such as liability insurance, and (4) the award was within the parameters of the evidence. Under such circumstances, we will not substitute our judgment for that of the jury as to reasonable compensation for a plaintiff.

*Kimberlin v. DeLong,* 637 N.E.2d 121, 130 (Ind.1994).

■ The transcript of the proceedings and a review of the parties' appellate briefs indicate that Boyer does not dispute the Weinberger Entities' calculation of incurred medical expenses in the approximate amount of $3,000. In addition, the Weinberger Entities invited the jury to award $5,000 for revision surgery[6] which Boyer acknowledged during trial that he "assume[d] [he] will have to have[.]" (Tr. p. 1068). No evidence was presented relevant to lost wages or level of impairment.

■ Mindful of the approximate $8,000 in tangible, medical expenses, this leaves an award of $292,000 for future medical expenses and emotional damages for pain and suffering. Awards for pain, suffering, and mental anguish are particularly within the province of the jury because they involve the weighing of evidence and the credibility of the witnesses. *Ritter,* 745 N.E.2d at 845. Physical and mental pain are, by their very nature, not readily susceptible to qualification and, thus, the jury is given wide latitude in determining these kinds of damages. *Id.* Where the damages cannot be calculated with mathematical certainty, the jury has liberal discretion in assessing damages. *Id.* Our inability to look into the minds of jurors and determine how they computed an award is, to a large extent, the reason behind the rule that a verdict will be upheld if the award falls within the bounds of the evidence. *Id.*

It is undeniable that Boyer sustained emotional injuries and mental anguish due to Weinberger's treatment. The evidence most favorable to the jury award reflects that Boyer is currently being treated by an allergist for allergy symptoms which were made worse by Weinberger's procedures and surgery. Specifically, Dr. Han testified that the recirculation issue, which was caused by Weinberger poking holes in Boyer's healthy sinuses, made Boyer's "allergy symptons ... worse." (Tr. p. 386). Not only did Weinberger put Boyer's life at risk by performing surgery on a patient with an abnormal EKG reading, he also physically impaired Boyer by poking holes in his sinuses which exacerbated his symptons. Adding insult to injury, after the unnecessary surgery, Weinberger administered eight post-operative debridements without anesthesia, causing Boyer to compare the pain to medieval torture. After several months, painful debridements, and deteriorating congestion problems, Weinberger, with full knowledge of Boyer's undiagnosed arrhythmia, suggested a second surgery. Before the surgery could be scheduled, Weinberger abandoned his patients and left the county. As Boyer sought other medical treatment and prepared to undergo corrective surgery with Dr. Han, he was finally informed that he had an abnormal arrhythmia and needed to see a cardiologist prior to even attempting surgery, as surgery would be life-threatening. In light of this evidence and our deference to the jury in awarding damages, we cannot conclude that this award was influenced by passion or prejudice.

Nevertheless, the Weinberger Entities assert that because the verdict is considerably larger than those in purportedly similar cases, the amount of damages in the instant case is exorbitantly high. In a demonstration of comparative evaluation, the Weinberger Entities focus on *Wal-Mart Stores, Inc. v. Blaylock,* 591 N.E.2d

---

**6.** Although the Weinberger Entities now dispute the revision surgery in their appellate brief, they conceded this amount at trial. As they invited what they now perceive as error, they can no longer dispute this. *See Witte v. Mundy ex rel. Mundy,* 820 N.E.2d 128, 133 (Ind.2005) (A party may not take advantage of an error that she commits, invites, or which is the natural consequent of her own neglect or misconduct.)

624, 625–26 (Ind.Ct.App.1992), *trans. denied*, in which the jury awarded $50,000 to an elderly customer who injured his foot against a store display but continued to shop prior to reporting the incident.

In *Ritter*, we cautioned against the use of a comparability analysis to determine compensatory damage claims. *Ritter*, 745 N.E.2d at 847. More importantly, we noted that historically, our courts have always expressed disfavor in evaluating cases other than on their own merits. *Id.* Clearly, identical injuries may have radically different effects on different plaintiffs. *Id.* at 848. "Because we lack the ability to attach price tags to given functions and talents, the translation of social wrongs into dollars and cents is problematic at best." *Id.*

> If a comparability analysis is applied to reduce awards exceeding the range of purportedly similar cases, the effects are far-reaching. Because a comparability analysis effectively places a "cap" on the jury's award regardless of the evidence, it can be considered to be second guessing jury decisions in a manner not permitted by the Seventh Amendment. Without express statutory authority, no decisionmaker should have the power to alter a jury's award without regard for the evidence. If a jury's award can be subject to being set aside for exceeding an applicable range, the charge of the jury to fully compensate the plaintiff would no longer be paramount. The jury's decision on the amount of compensation would be replaced with a figure within the "comparable range." Although the jury would still find facts and calculate an amount that would compensate the plaintiff, it is disingenuous to claim that restricting the award after the fact by comparing it to other cases would not change the functioning of the jury by effectively rendering it less of a final decisionmaker and more of an advisory jury. The comparability analysis

renders illusory the jury's discretion to compensate a victim.

*Id.* at 849.

While it may be tempting to engage in a comparative analysis to aid us in the difficult task of evaluating the award at issue in this case, to do so would be a significant departure from Indiana's historical regard for the uniqueness of every tort claim and the belief that compensatory damage assessments should be individualized and within the province of the factfinder. After reviewing the testimony and evidence presented to the jury it is clear that such a departure is not necessary here.

Even if we were to hazard a comparative analysis, the damage award falls within the parameters set by the Weinberger Entities. In their appellate brief, the Weinberger Entities assert that "[i]n Indiana, one of the highest ratios of special damages to a jury verdict upheld in a published opinion has been approximately 50 to 1." (Appellants' Br. p. 33). Using the $8,000 aggregate in special damages, the jury's verdict of $300,000 was only 37.5 percent greater than Boyer's special damages—well within the 50 to 1 ratio suggested by the Weinberger Entities. We affirm the jury award.

## CONCLUSION

Based on the foregoing, we hold that (1) the trial court properly denied the Weinberger Entities' motion for change of judge; (2) the trial court did not abuse its discretion when it failed to strike jurors for cause; (3) the testimony on Weinberger's breach of his standard of care in Boyer's treatment was properly admitted; (4) the result of Boyer's EKG was properly admitted; (5) evidence of Weinberger's flight and absence from the country was properly admitted; (6) the admission of evidence regarding Weinberger's standard of medical care for patients other than

Boyer was harmless; (7) Boyer was permitted to call the Weinberger Entities' expert witness in his case-in-chief; (8) the trial court properly denied the Weinberger Entities' motion for judgment on the evidence; and (9) the jury award was not excessive.

Affirmed.

NAJAM, J. and MAY, J. concur.