# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**MICHAEL RILEY**
Rensselaer, Indiana

ATTORNEYS FOR APPELLEE:

**PAUL A. RAKE**
**GREGORY A. CRISMAN**
Eichhorn & Eichhorn, LLP
Hammond, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DUNELAND PROPERTIES, LLC, | ) | |
| DUNELAND SAND, INC., DUNELAND | ) | |
| SAND ENTERPRISES, LLC, | ) | |
| DUNELAND HOLDINGS, LLC, | ) | |
| DAVID LASCO and LASCO FAMILY, | ) | |
| TRUST, | ) | |
| | ) | |
| Appellants/Defendants, | ) | |
| | ) | |
| vs. | ) | No. 56A03-1308-PL-320 |
| | ) | |
| NORTHERN INDIANA PUBLIC | ) | |
| SERVICE COMPANY, | ) | |
| | ) | |
| Appellee/Plaintiff. | ) | |

APPEAL FROM THE NEWTON SUPERIOR COURT
FORMERLY FROM THE PORTER SUPERIOR COURT
The Honorable Daniel J. Molter, Judge
Trial Court Cause No. 56D01-1109-PL-6
Formerly Cause No. 64D01-0710-PL-9891

**July 30, 2014**

**OPINION – FOR PUBLICATION**

**VAIDIK, Chief Judge**

## Case Summary

In 1955 Northern Indiana Public Service Company (NIPSCO) acquired a 100-foot-wide easement for electrical lines in Porter County. In 2007 NIPSCO filed a complaint for a permanent injunction alleging that its easement—which went across property that was later determined to be held by Duneland Holdings, LLC—had been violated by the previous landowners by mining the sand on the easement, causing difficulties in maintaining and servicing its poles. The trial court ordered that the easement be relocated and that Duneland Holdings pay NIPSCO $245,858 for the costs of reconstructing the power lines on the new easement.

Duneland Holdings now appeals. First, it contends that NIPSCO's failure to mitigate damages is a bar to relief. Second, it contends that the trial court erred in admitting Plaintiff's Exhibit 5—a material and labor estimate prepared by a long-time NIPSCO engineer for relocating the power lines onto the new easement—into evidence because it is hearsay. Because mitigation of damages is not a defense to liability and NIPSCO in fact mitigated its damages, this issue is not a bar to NIPSCO's recovery. In addition, experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field. Here, NIPSCO's engineer testified that he relied on data from other NIPSCO departments in arriving at his material and labor estimate. The trial court therefore did not abuse its discretion in admitting Plaintiff's Exhibit 5. We affirm the trial court.

**Facts and Procedural History**

NIPSCO is a public utility whose primary purpose is to furnish natural gas and electrical power to northern Indiana, including Porter County. In 1955 NIPSCO acquired a 100-foot-wide easement on property in Porter County in order to install, maintain, operate, repair, and replace towers and poles for the transmission, distribution, and delivery of electrical power to the public. Appellee's App. p. 6-7. Pursuant to that grant, NIPSCO built a 138,000-volt transmission circuit between substations near Crown Point and Valparaiso. NIPSCO's easement passes along the southern edge of a sand mine located on a 374-acre tract of land.

In the 1970s Jerry Lambert became involved with this 374-acre tract of land when he formed a partnership with three other people to operate a sand-mining operation. NIPSCO's easement was properly recorded, and the partners were aware of it. Later, during the 1990s, Lambert acquired all right, title, and interest in the 374-acre tract from the other partners and continued operating the sand mine as a sole proprietor.

In 1999 James Hayward, a NIPSCO engineer, was asked to address the property owner's desire to remove sand near NIPSCO's easement. Hayward visited the property and prepared an estimate to move the power lines to a different location on the property in order to accommodate the property owner's desire to mine sand on NIPSCO's easement. *Id.* at 101. NIPSCO's estimate was approximately $125,000. Tr. p. 66. Sand excavations did not begin at this time.

In 2000 Lambert created two business entities to further pursue sand mining from the tract of land: Duneland Properties, LLC (which owned the land) and Duneland Sand,

3

Inc. (which operated the sand-mining business). Lambert and his son-in-law, John Durachta, each owned a 50% interest in the entities. Durachta acted as general manager of Duneland Sand until late 2003. During this time, Durachta directed the removal of sand from both the tract of land and NIPSCO's easement. The mining took place over several months. In June 2003 NIPSCO's attorney sent a letter to Durachta directing Duneland Sand to cease and desist its sand mining on NIPSCO's easement:

> We are contacting you because NIPSCO has discovered that the Easement has been materially adversely violated by [Duneland Sand]. Specifically, excavation activity by, through or under [Duneland Sand] encroaches along the Easement a distance of approximately 2,200 feet. The excavation activity has significantly compromised the structural integrity of four (4) structures and made it unsafe, and in certain cases impossible, to gain access to the structures with the equipment required to maintain and operate the Electric Transmission Facility. Moreover, the excavation activity has made it impossible for NIPSCO to gain access between the structures to maintain and operate the Electrical Transmission Facility. . . .
>
> The Electric Transmission Facility is a major facility and the adverse consequences of [Duneland Sand's] excavation activity are significant. On behalf of NIPSCO, we demand that your company immediately stop, directly or by, through or under any third parties, any further excavation activity in the Easement.

Appellee's App. p. 56-57. NIPSCO's estimate, prepared in August 2003, showed that the cost of moving the power lines was now $155,389. Def.'s Ex. D.

Although Duneland Sand stopped mining NIPSCO's easement for a period of time following its receipt of the letter from NIPSCO's attorney, it resumed mining NIPSCO's easement in 2006 because Lambert said the sand was "too valuable." Appellee's App. p. 69. Then, in December 2006, Lambert, as President and Managing Member of Duneland Sand and Duneland Properties, respectively, entered into an agreement with Kevin Misch to sell both companies. Pursuant to the agreement, Misch assumed the obligation for the

4

defense of any claim by NIPSCO for Duneland Sand's and Duneland Properties' alleged infringement of NIPSCO's easement and agreed to hold both companies harmless. *Id.* at 13, 38. Eventually, Duneland Properties, Duneland Sand, Duneland Sand Enterprises, LLC, Duneland Holdings, LLC, David Lasco, and the Lasco Family Trust ("Duneland Entities") became the responsible parties answerable to NIPSCO's claims. *See* Appellee's Br. p. 2. This was in part because Lambert sold his interests in Duneland Sand and Duneland Properties. Later, during the litigation, Lasco established Duneland Holdings and had the property transferred to it. Finally, Misch was removed from the litigation, which left Lasco as the principal behind the remaining defendants. *Id.* at 3.

In October 2007 NIPSCO filed a complaint for a permanent injunction alleging, among other things, that the then-relevant defendants, Duneland Sand and Duneland Properties, while operating a sand mine in Porter County, "encroached upon, wasted and damaged NIPSCO's easement causing it property damage by changing grade and undermining the integrity of its power transmission facilities thereby jeopardizing the reliability of electrical service to the public." Appellee's App. p. 3. NIPSCO therefore requested the court to issue a mandatory injunction "directing the . . . defendants to be jointly and severally responsible for fill and moving fill in a timely manner to and around the excavated areas around the NIPSCO towers per NIPSCO's specifications" and "be permanently enjoined from encroaching upon or damaging the property interests of NIPSCO in the continued unencumbered use of its easement for electric transmission or distribution lines as is the subject of its original grant." *Id.* at 3-4 (quotation omitted). The Duneland Entities then filed a cross-claim against Lambert.

In February 2011 the trial court ordered that the Duneland Entities were permanently enjoined from further encroaching or otherwise committing additional waste within NIPSCO's easement. Appellants' App. p. 24. After numerous court-sponsored settlement discussions, in August 2011 the parties submitted a stipulated order that the court entered. The order states, in relevant part:

> The Court reaffirms its prior order that NIPSCO is entitled to remediation to secure its easement. . . . With the consent of the parties, NIPSCO and the Duneland Entities including Duneland Holdings, LLC, the Court further orders that the scope of remediation will encompass NIPSCO's relocation of its power lines to a new 100 foot wide easement as put forth into evidence with remediation of the remaining grade.

*Id.* at 26. The court reserved its ruling to determine the costs of remediation and the allocation of costs among the parties. *Id.*

Nearly two years later, in April 2013, the court held a hearing to determine the costs of remediation and how to allocate the costs among the parties. At the hearing, NIPSCO presented the testimony of Timothy Kizer, a state-licensed civil engineer and NIPSCO employee. Kizer testified about the costs of relocating the power lines onto the new 100-foot-wide easement. Kizer talked about Plaintiff's Exhibit 5, which is a material and labor estimate generated by NIPSCO's internal computer software using the current labor index for labor costs and its purchasing ledger for material costs. The estimate, which is for $245,858, was prepared in March 2013.

In May 2013 the court entered findings and conclusions. The court found that NIPSCO did not fail to mitigate its damages by failing to protect its easement during years of obvious Duneland excavation into the easement. *Id.* at 9. In fact, the court found that NIPSCO mitigated its damages because it is the one that proposed moving the easement to

6

a new location because restoring the existing easement would have cost $2.7 million.  *Id.*

The court concluded:

> [NIPSCO] has an equitable right to be made whole for the loss of its easement rights in their current location.  There is no adequate remedy at law.  Damages will not alone suffice to protect its transmission facilities or to allow for the future use of its extended utility corridor or to assure that it is not unduly compromised by problems at this location.
>
> No objection has been presented to the proposed equitable solution of requiring that the servient estate owner grant [NIPSCO] an alternate easement in the form as set forth in Plaintiff's Exhibit 8.  Upon proper demonstration of the record title holder's authority, the same should be executed and delivered by it to [NIPSCO].
>
> That grant when conferred will allow for a relocation of the current transmission circuit upon payment therefore as set forth below.  Upon completion of the reconstructed circuit, the old easement will be released with an appropriate filing of record by [NIPSCO].
>
> The cost of relocating the utility facilities is best represented by the estimate of [NIPSCO]. There has been no other alternative estimate offered by Defendants.  While Defendants have show[n] that this estimate has increased over the years from certain earlier proposals, these were prior settlement offers and are not properly probative except to suggest that the same methodology has been used by [NIPSCO] and that costs have gone up over time as one might anticipate.  Defendants cannot complain[] about any costs caused by delay to which they have contributed.
>
> Defendants cross examined [NIPSCO's] engineer about the components of the estimate and the reasons for his expert opinions but they have provided no evidentiary basis upon which to reject his conclusions.  There was no suggestion of alternative numbers for overhead, labor costs or material costs.
>
> There was no evidence showing how these approximated sums were inaccurate as estimates for the anticipated work.

*Id.* at 12-13.  The court ordered as follows:

> That Duneland Holdings, LLC or the current record servient estate owner execute the easement grant Exhibit 8 and deliver the same to [NIPSCO] within ten (10) days of the Court's order;

> That Duneland Holdings, LLC or a sufficiently related Defendant entity pay into Court the sum of $245,858 for the reconstruction cost of the alternate transmission circuit not later than October 1, 2013;
>
> That [NIPSCO] is given a judgment lien against the entire property encompassed within the sand mine owned by Duneland Holdings, LLC or any related Defendant entity in the amount of $245,858;
>
> That, to the exten[t] required, this is to be considered a final appealable order or otherwise subject to interlocutory appeal as of right under Ind. App. Rule 14; and
>
> That a further remediation remedy is hereby entered prospectively to include filling in the remaining excavations on the alternate easement to be completed within a reasonable time after the Court fashions its equitable order once judgment is entered on the jury trial among the Counter-Claimants.

*Id.* at 14. The Duneland Entities filed a motion to correct error, which the trial court denied.

The Duneland Entities now appeal.

## Discussion and Decision

The Duneland Entities raise two issues on appeal. First, they contend that NIPSCO's failure to mitigate damages is a bar to relief. Second, they contend that the trial court erred in admitting Plaintiff's Exhibit 5—a material and labor estimate for relocating the power lines onto the new easement—into evidence because it is hearsay.

## I. Mitigation of Damages

The Duneland Entities contend that the trial court should have taken into consideration that NIPSCO "fail[ed] . . . to protect the easement during years of obvious Duneland excavation into the easement." Appellants' Br. p. 9; *see also id.* at 10 ("NIPSCO, while warning Duneland and its previous owners as to the fact that they were removing sand from the easement, did nothing until they filed suit some four years after the 2003

8

estimate and some eight years after the 1999 estimate."). Therefore, their argument continues, NIPSCO's failure to mitigate damages is a "bar to the right of equitable relief." *Id.* at 7; *see also id.* at 11 ("The trial court should . . . not have given NIPSCO the money judgment that they requested."). However, the Duneland Entities confuse laches, which is a *complete bar* to recovery, with failure to mitigate damages, which is an affirmative defense that may *reduce the amount of damages* a plaintiff is entitled to recover after liability has been found.

The principle of mitigation of damages addresses conduct by an injured party that aggravates or increases the party's injuries. *Willis v. Westerfield*, 839 N.E.2d 1179, 1187 (Ind. 2006). Mitigation of damages is not an affirmative defense to liability. *Id.* Rather, failure to mitigate damages is an affirmative defense that may reduce the amount of damages a plaintiff is entitled to recover after liability has been found. *Id.* Put simply, a plaintiff in a negligence action has a duty to mitigate his post-injury damages, and the amount of damages a plaintiff is entitled to recover is reduced by those damages that reasonable care would have prevented. *Id.* The defendant bears the burden of proving that the plaintiff has not used reasonable diligence to mitigate damages. *Id.* The defendant's burden includes proof of causation, that is, proof that the plaintiff's unreasonable post-injury conduct has increased the plaintiff's harm and, if so, by how much. *Id.*

In contrast, laches is an equitable defense that may be raised to stop a person from asserting a claim that he would normally be entitled to assert. *Ind. Real Estate Comm'n v. Ackman*, 766 N.E.2d 1269, 1273 (Ind. Ct. App. 2002). The rationale behind the doctrine of laches is that a person who, for an unreasonable length of time, has neglected to assert a

9

claim against another waives the right to assert the claim when this delay prejudices the person against whom he would assert it. *Id.* Laches requires: (1) inexcusable delay in asserting a known right; (2) an implied waiver arising from knowing acquiescence in existing conditions; and (3) a change in circumstances causing prejudice to the adverse party. *SMDfund, Inc. v. Fort Wayne-Allen Cnty. Airport Auth.*, 831 N.E.2d 725, 729 (Ind. 2005).

Here, the evidence shows that NIPSCO mitigated its damages. The trial court's findings recognize as much:

> Although [NIPSCO] is legally entitled to have the topography of its easement remediated to a grade sufficient to support maintenance and reconstruction of existing as well as future power lines, the size and scope of the existing excavations made by the Duneland entities makes the restoration of the existing easement expensive since the estimate cost has been projected to be $2.7 million.

> In this context, [NIPSCO] proposed at a truncated hearing on July 14, 2011, that an alternative easement location could be considered as a compromise to mitigate damages under certain conditions. This resulted in an agreed order which the Court adopted on August 9, 2011, which among other things concluded that, "NIPSCO is entitled to remediation to secure its easement" and that "the scope of the remediation will encompass NIPSCO's relocation of its power lines to a new 100 foot wide easement as put forth into evidence with remediation of the remaining grade."

Appellants' App. p. 9. Given this ruling, the Duneland Entities cannot use this appeal to back away from their prior agreement, which included granting NIPSCO "an alternate easement in the form as set forth in Plaintiff's Exhibit 8." *Id.* at 12. The cost of relocating the power lines onto a new easement is considerably less than restoring the original topography, and was most likely the reason why the Duneland Entities entered into the

10

agreement in the first place.  Because mitigation of damages is not a defense to liability and NIPSCO in fact mitigated its damages, this issue is not a bar to NIPSCO's recovery.[1]

## II. Indiana Evidence Rule 703

The Duneland Entities argue that the trial court erred by admitting Plaintiff's Exhibit 5—Kizer's material and labor estimate for relocating the power lines onto the new easement—into evidence because it is hearsay.  We review a trial court's decision on the admissibility of evidence for an abuse of discretion, which occurs when the decision is against the logic and effect of the facts and circumstances before the court.  *Weinberger v. Boyer*, 956 N.E.2d 1095, 1104 (Ind. Ct. App. 2011), *trans. denied.*  Even where the trial court's decision is erroneous, however, we will not reverse the judgment where the decision does not prejudice the substantial rights of a party.  Ind. Trial Rule 61; *Weinberger*, 956 N.E.2d at 1104.

Hearsay is a statement that is offered in evidence to prove the truth of the matter asserted.  Ind. Evidence Rule 801(c)(2).  Hearsay is not admissible unless our Evidence Rules or other law provides otherwise.  Evid. R. 802.

Kizer is a state-licensed civil engineer.  He received his engineering degree from Valparaiso University in 1978.  Tr. p. 37.  At the time of the hearing, Kizer had worked in

---

[1] As for the fact that NIPSCO's estimates for moving the power lines onto the new easement increased from 1999 to 2003 to 2013, the trial court noted:

> While Defendants have show[n] that this estimate has increased over the years from certain earlier proposals, these were prior settlement offers and are not properly probative except to suggest that the same methodology has been used by [NIPSCO] and that costs have gone up over time as one might anticipate.  *Defendants cannot complain[] about any costs caused by delay to which they have contributed.*

Appellants' App. p. 13 (emphasis added).

11

NIPSCO's transmission-line department for thirty-five years. *Id.* His focus is on design and ordering of materials, including steel structures, transmission lines, and wood and steel poles. *Id.*

During the hearing, the Duneland Entities did not challenge Kizer's qualifications as an expert engineer. In fact, the Duneland Entities did not object when Kizer testified about his process of obtaining an estimate for restoring the original easement. *See id.* at 43. That is, Kizer testified that he requested a topographical survey from an independent land surveyor and then took that data and determined the volume of fill that would be required to restore the easement to its original condition of 100 feet wide. *Id.* That cost was $2.7 million. *Id.* But because of the high cost of restoring the original easement, Kizer decided to go with an alternate easement, which was much cheaper.

Kizer then testified how Plaintiff's Exhibit 5 was prepared:

> We have a computer software package that we have to physically enter in each material item and it's a step by step process. And we put in poles, wire, connectors, clamps and any piece of hardware that we need, and then it automatically retrieves the material costs from our purchasing system and then it applies the labor index, the current labor index, to the labor multiplier that's attached to each material. And then it generates the numbers and puts in all the accounting for things like payroll tax, etc. automatically and then generates a total cost for the project.

*Id.* at 48. Counsel for Lambert[2] objected on grounds that Kizer was "an engineer, not an accountant. He has no personal knowledge of the numbers contained within Exhibit 5, nor has he laid any foundation to show that he has any personal knowledge other than a computer program." *Id.* at 49. Kizer first responded that he relies on material and labor

---

[2] According to the Appellants' Brief, "At the hearing conducted before the trial court, the Defendant, Lambert, by his counsel, was engaged in the questioning of this witness but both defendants had indicated that they were jointly presenting their side of the case." Appellants' Br. p. 13.

estimates in actually building power lines.  *Id.*   Then, he elaborated where the costs of

materials and labor come from:

> And once we know what we need to do the design, we go and individually pick out each of those items.  And if we don't pick it out, we don't get it.  And so we list everything we need.  We have to determine what it is, we put it in there and then all the computer, all the computer is doing is adding things up, it's not doing any engineering for you, it's just adding up the total costs of the material and the total cost of the labor associated with that item that you put in.

* * * * *

> The material cost comes directly from our purchasing ledger.  So the last time they bought that item, that's what it cost and that's where it gets that number.  And then the labor was – there's an associated labor figure with each material item, and that labor figure was determined by construction people and engineering people looking at every facet of how this piece of equipment is built and determining how long it should take them to do that and they assign a time figure to that.  And then that time figure is totaled up and then there is a labor index that is the current cost of a lineman, say whatever his labor cost is per hour.  All those hours are added up for all those materials and then multiplied by that to give us the total hours for that job.

*Id.* at 50.   Counsel for Lambert then voir dired Kizer about his personal knowledge of the

costs of materials and labor:

> Q      Mr. Kizer, you don't have any personal knowledge of what the material cost specifically of a pole is, do you? . . .
> A      Well I have.  Yeah I have data that shows me what those costs are.
> Q      You don't work in the accounting department?
> A      No, I don't work in the accounting department.
> Q      You don't work in the billing department?
> A      No, but they supply the data for me.
> Q      You don't work in the labor department?
> A      I don't have to.  I get the information that I need to do my estimate, so I get the cost for the poles.
> Q      What you testified to is you plug into a computer program the specific items, right?
> A      That's correct.
> Q      For this detail.
> A      Yep.

13

Q    And then the computer tells you what those costs are?
A    That's correct.
Q    You don't talk to the billing department?
A    I don't have to.
Q    You don't talk to a purchasing department?
A    No.
Q    You don't talk to the accounting department?
A    No, it saves me time.  I don't have to.
Q    So you don't have any personal knowledge as to what a pole costs or what the material and labor costs are for all these respective items?
A    Yeah, I do.  It's right there; it shows me what it costs.
Q    Because the computer told you that, right?
A    That's right, because they put those costs in there.
Q    So you are basing your testimony on what the computer has told you, correct?
A    Based on what the people who buy these poles put in.  I don't have to go out and buy them.
Q    Did you talk to anybody that's bought a pole?
A    Yeah, I talk to them all the time.  But I don't have to ask them because they put the data in.
Q    Specifically, you didn't talk to anybody, any live body, about all these numbers, did you?

* * * * *

A    Because I've done this for many years, they put these costs in there.  Now there's times where I do get an estimate for a specific project where it has a large number of poles; I would get these individual costs.  I have seen these individual costs per poles. . . . *But I rely on other departments to do their job so I can do mine*.

*Id.* at 51-52 (emphasis added).

We find that Kizer was entitled to base his estimate on NIPSCO's internal computer software using the current labor index for labor costs and its purchasing ledger for material costs.  Indiana Evidence Rule 703 provides:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field.

14

This rule is based on the assumption that truly qualified experts are capable of evaluating the information of a sort normally relied on by others in their field. 13 Robert Lowell Miller, Jr., Indiana Practice, Indiana Evidence, § 703.108 (3rd ed. 2007). Although an expert may rely on others' opinions as a basis for his opinion if other experts in the field reasonably rely on such opinions, the expert must bring his own expertise to bear in reaching his opinion and may not simply repeat opinions of others or announce that other experts concur with his opinion with respect to the case. 13 Robert Lowell Miller, Jr., at § 703.109. As our Supreme Court has explained:

> [S]ome experts customarily gather information from a variety of other experts and authoritative sources and rely upon it in reaching their opinions. When an expert witness's own independent opinion is arrived at in this manner and it is introduced into evidence and the expert witness is subject to cross-examination, that part of the substrata of information which aided in the formation of the opinion, though hearsay in nature and though not falling within any hearsay exception, may nevertheless be admissible for use by the trier of fact in judging the weight of the opinion.

*Miller v. State*, 575 N.E.2d 272, 274 (Ind. 1991). However, such hearsay is inadmissible where it is merely a restatement of another's conclusion "as a conclusory answer to an ultimate fact in issue," such that the veracity of the statement is not "subject to the test of cross-examination." *Barrix v. Jackson*, 973 N.E.2d 22, 26 (Ind. Ct. App. 2012), *trans. denied*.

Here, Kizer, who has been designing and ordering materials at NIPSCO for "many years" as part of his engineering job, testified that he relies on data from other NIPSCO departments so that he can complete material and labor estimates, which are then used in building power lines. Kizer therefore reasonably relied on the current labor index, NIPSCO's purchasing ledger, and other materials—even if hearsay and not falling within

15

any exception—when completing Plaintiff's Exhibit 5.  Notably, Kizer brought his own engineering expertise to bear in preparing this estimate, as he testified that the computer program does not perform any engineering functions.  Rather, Kizer performs that aspect. Accordingly, the trial court did not abuse its discretion in admitting Plaintiff's Exhibit 5.

Affirmed.

NAJAM, J., and BROWN, J. concur.