# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**JAMES L. HOUGH**
**AMI ANDERSON NOREN**
Merrillville, Indiana

ATTORNEYS FOR APPELLEE:

**DAVID J. CUTSHAW**
**GABRIEL A. HAWKINS**
**KELLEY J. JOHNSON**
Indianapolis, Indiana

**BARRY D. ROOTH**
**HOLLY S.C. WOJCIK**
Merrillville, Indiana

**FILED**

Jan 31 2013, 9:02 am

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARK S. WEINBERGER, M.D., et al., | ) | |
| | ) | |
| Appellant-Defendants, | ) | |
| | ) | |
| vs. | ) | No. 45A05-1203-CT-107 |
| | ) | |
| GLORIA GILL, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable William E. Davis, Judge
Cause No. 45D05-1007-CT-127

**January 31, 2013**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

Mark S. Weinberger, ("Weinberger") M.D.; Mark Weinberger, M.D., P.C.; Merrillville Center for Advanced Surgery, LLC; and Nose and Sinus Center, LLC, (collectively, "the Weinberger Entities"), appeal the jury's award of damages in the amount of $150,000 to Gloria Gill ("Gill") following Gill's medical malpractice action.

We affirm.

## ISSUES

1. Whether the trial court erred by denying the Weinberger Entities' motion for judgment on the evidence.

2. Whether the trial court erred in admitting evidence.

## FACTS

In December 2003, forty-seven-year-old Gill sought treatment from Weinberger for migraines and "congestion." (Tr. 1406). Weinberger ordered a CT scan and informed Gill that polyps in her sinuses were causing her discomfort. Weinberger told Gill that sinus surgery would solve her problems. Three weeks later, on December 27, 2003, Weinberger performed surgery on Gill. The operative report indicated that Weinberger performed nearly every type of procedure within the field of sinus and nose surgery in the single surgery, including the following seven procedures: 1) bilateral total endoscopic ethmoidectomy with stereotactic guidance; 2) bilateral endoscopic maxillary antrostomy with stereotactic guidance; 3) bilateral endoscopic sphenoidotomy with stereotactic guidance; 4) radiofrequency palate reduction; 5) bilateral radiofrequency

2

turbinate reduction; 6) image-guided endoscopic sinus surgery with Stryker navigation system; and 7) septoplasty. Immediately after surgery, Weinberger told Gill's husband that the surgery was a success but that a second surgery might be necessary.

Following surgery, Gill was in considerable pain and her sinuses bled for several days. During her first post-operative appointment with Weinberger in January 2004, Gill explained that she was feeling worse than she did before the surgery and that she had shooting pains through her face. Weinberger inserted a scope up both sides of Gill's nose without using numbing spray, which caused Gill a great deal of pain. His medical notes state that it was a "routine postop visit," and that Gill was "healing well." (Tr. 1426).

During subsequent visits, Gill continued to complain that she was not feeling any better and that she had sharp pains shooting through her face and cheekbones. Weinberger, however, rarely responded to Gill's concerns. According to Gill, "Weinberger didn't say . . . five words to [her] after [her] surgery." (Tr. 1434). Five months after surgery, with Weinberger failing to address her concerns or even speak to her, Gill decided to stop attending her follow-up appointments. Her last appointment with Weinberger was on April 7, 2004.

During the nine months following the surgery, Gill was unable to ride her motorcycle because the wind "getting up into [her] nose and [her] head" was too painful. (Tr. 1437). She began snoring so loudly that she and her husband could no longer sleep in the same bed or room together. Further, Gill's congestion, pressure, and headaches were all much worse than before she had surgery.

In September 2004, Gill saw Weinberger's face "plastered up on the TV," and learned that while he was on vacation in the Mediterranean with his family, Weinberger disappeared in the middle of the night. (Tr. 1439). Weinberger never notified his patients that he was leaving his practice or referred them to another doctor. Shortly thereafter, Gill, who was still suffering from congestion, pressure, and drainage, scheduled an appointment with Dr. Dennis Han. The results of a CT scan revealed that the only procedure Weinberger had performed during Gill's surgery was drilling two unnecessary holes in her sinuses. The holes resulted in chronic sinusitis caused by recirculation issues. Specifically, Dr. Han explained the recirculation phenomenon as follows:

> If you place a surgical opening further back along the natural drainage pathway of the maxillary sinus and the nose, the mucus just falls right back into the sinus. . . . So the mucus is normally secreted in the maxillary sinuses, it just keeps on recirculating into the nasal cavity and then falls back in the sinus and you get a mucus buildup and inflammation. And the main symptom for that would be inflammation that might cause initial congestion, but also patients have excessive drainage, post-nasal drip from this condition.

(Tr. 483-84). Dr. Han recommended corrective surgery, which he performed in December 2004.

Shortly thereafter, Gill filed a proposed complaint for medical malpractice against the Weinberger Entities with the Indiana Department of Insurance. Also in December 2009, Weinberger was apprehended in a tent in the Italian Alps. On December 17, 2009, the medical review panel issued a unanimous opinion, finding that the Weinberger

4

Entities had failed to comply with the appropriate standard of care. On March 12, 2010, Gill filed her Complaint for medical malpractice against the Weinberger Entities. The Complaint provides in relevant part as follows:

1.    At all times relevant hereto, Gloria Gill, was a patient of Weinberger.

2.    At all times relevant hereto, Weinberger was a physician duly licensed to practice medicine under the laws of the State of Indiana.

3.    On October 3, 2003, Weinberger undertook the care and treatment of the plaintiff.

4.    In caring for and treating the plaintiff, Weinberger failed to comply with the applicable standards of care.

5.    As a direct and proximate result of said acts and omissions on the part of Weinberger, the plaintiff suffered severe and permanent physical injuries and disabilities which affect her ability to enjoy life, has suffered and will continue to suffer in the future, great pain, emotional distress and mental trauma, has incurred and will continue to incur in the future, reasonable medical and related expenses, and has lost and will continue to lose wages, profits and income.

(Appellant's App. 24).

At the outset of trial, which began on October 31, 2011, the trial court instructed the jurors regarding the following seven separate and distinct acts of medical malpractice:

In this lawsuit, Gloria Gill, claims that Dr. Mark Weinberger committed the following acts of malpractice and that Dr. Weinberger's corporations are also responsible for these acts of malpractice:

1.    Dr. Weinberger failed to recommend non-surgical treatment for Mrs. Gill's symptoms, such as medicines or allergy testing, before recommending and performing sinus surgery on Mrs. Gill.

5

2. Dr. Weinberger misread Mrs. Gill's X-rays as showing extensive sinus disease and problems, which Dr. Weinberger used as a basis for negligently recommending surgery even though Mrs. Gill had no disease in her sinuses.

3. Because Dr. Weinberger failed to tell Mrs. Gill what her actual medical problems were and what he was actually going to do during surgery, Dr. Weinberger failed to get Mrs. Gill's informed consent to do surgery.

4. Because Mrs. Gill did not actually have sinus disease, there was no need to perform surgery on her and Dr. Weinberger performed unnecessary surgery under general anesthesia.

5. Dr. Weinberger failed to perform the surgeries he told Mrs. Gill he was going to do and billed her for these surgeries anyway.

6. Instead of doing a proper surgery to Mrs. Gill's maxillary sinuses, Dr. Weinberger unnecessarily and improperly drilled two holes in Mrs. Gill's sinuses where they are not supposed to be.

7. Dr. Weinberger abandoned Mrs. Gill when she needed treatment for complications caused by his surgery and left the country.

8. The Defendants deny that they committed any acts of medical malpractice.

(Tr. 350-51).

During the trial, Gill's expert witness, Dr. Victor Mokarry, testified that based upon his review of the CT scans of Gill's sinuses that were taken and read by Weinberger before Gill's sinus surgery, Gill did not have sinus disease. Specifically, the scans did not show what Weinberger said that they did, and Gill's sinus surgery was unnecessary. Dr. Mokarry further testified that Weinberg's recommendation for surgery based on these scans, his failure to make any effort to recommend treatment other than surgery on the

6

first day he met with Gill, and his recommendation of unnecessary surgery were all violations of the applicable standards of care. Also at trial, Gill testified, without objection, that she felt angry and humiliated when she learned that Weinberger had disappeared in the middle of the night. She felt this way because Weinberger was her doctor, and she had trusted him.

In addition, Janet Gadacz, Weinberger's former patient liaison, testified by video deposition that in the summer of 2004, Weinberger received thirty to forty packages that included tents, camping equipment, and tarps. She further testified that one day a limousine pulled up and six to eight businessmen that carried briefcases and did not speak English well were taken to a conference room to meet with Weinberger. The limousine driver apparently told Weinberger's staff that the men possibly had diamonds in their briefcases. Also during that time, several banks called Weinberger to confirm unusual activity on his credit cards as well as large withdrawals from ATM's. Lastly, Gadacz testified that during this time, medical malpractice lawsuits began arriving at the office. Weinberger seemed very anxious, and, although he was generally a very meticulous clean-cut man, he began walking around the office partially clothed with stubble on his face. Concerned about what was going on in the office, Gadacz gave a two-week notice and resigned her position.

Weinberger's former wife, Michelle Kramer, testified by video deposition that after Weinberger disappeared in the Mediterranean, she realized that bookkeeping practices had changed in his office and that Weinberger had "planned to leave." (Tr.

7

1283). Kramer concluded that Weinberger had disappeared because the "lawsuits" were threatening him. (Tr. 1290).

In addition, Robert Handler, the receiver appointed to manage Weinberger's medical practice after he left the country, testified by video deposition that Weinberger abandoned his practice a few weeks before Handler was appointed to be the receiver. Handler also explained that Weinberger had sent a large package of camping supplies to Paris before he left for the Mediterranean. Handler was able to recover the package from FedEx in Paris before Weinberger picked it up. The package contained hiking gloves, hiking socks, a portable hammock, electric foreign language translators, tent poles, sleeping bags, travel guides, and money hidden in one of the guides. Handler also testified that there was a lot of camping equipment found in Weinberger's office.

At the close of Gill's case-in-chief, the Weinberger Entities moved for judgment on the evidence with respect to Weinberger's abandonment of Gill, which the trial court denied. The Weinberger Entities renewed their motion after their presentation of evidence. At the close of the evidence, the trial court re-instructed the jury about the seven alleged acts of medical malpractice. A jury awarded Gill damages in the amount of $150,000, and the Weinberger Entities appeal.

## DECISION

### 1. Judgment on the Evidence

The standard of review for a challenge to a ruling on a motion for judgment on the evidence is the same as the standard governing the trial court in making its decision.

*Newland Resources, LLC v. Branham Corp.*, 918 N.E.2d 763, 770 (Ind. Ct. App. 2009). Judgment on the evidence is proper only where all or some of the issues are not supported by sufficient evidence. *Id.* The court looks only to the evidence and the reasonable inferences drawn most favorable to the nonmoving party, and the motion should be granted only where there is no substantial evidence supporting an essential issue in the case. *Id.*

The Weinberger Entities argue that the trial court erred in denying their motion for judgment on the evidence regarding Gill's claim of patient abandonment. We addressed this same issue in *Weinberger v. Boyer*, 956 N.E.2d 1095 (Ind. Ct. App. 2011), *trans. denied*. In that case, Boyer, like Gill, sought treatment from Weinberger for recurring problems with nasal congestion. Thirty minutes after Boyer walked into Weinberger's office without an appointment and agreed to a CT scan, Weinberger told Boyer that Boyer had sinus polyps and needed sinus surgery as soon as possible. Boyer had surgery in January 2004. Like Gill, he subsequently had more congestion problems than he did before surgery. After several months of placing rods in Boyer's nose to allegedly remove scarring, Weinberger suggested a second surgery. However, before the surgery was scheduled, Weinberger disappeared. Boyer, like Gill, filed a medical malpractice action against the Weinberger Entities. A jury subsequently awarded Boyer $300,000.

The Weinberger Entities appealed and argued that the trial court erred in denying its motion for judgment on the evidence regarding Boyer's claim of patient abandonment. This Court concluded that where only a claim for medical malpractice was made and no

separate tort claim for patient abandonment was raised, the Weinberger Entities' motion for judgment on the evidence was not directed at a critical or essential element of the medical malpractice claim but rather at an underlying issue with respect to the standard of care. We therefore affirmed the trial court's denial of the Weinberger Entities' motion.

Here, as in *Boyer*, Gill made only a claim for medical malpractice and no separate tort claim for patient abandonment was raised. Therefore, as in *Boyer*, the Weinberger Entities' motion for judgment on the evidence was not directed at a critical or essential element of the medical malpractice claim but rather at an underlying issue with respect to the standard of care, and the trial court did not err in denying the Weinberger Entities' motion.

2.    Admission of Evidence

The Weinberger Entities next argue that the trial court erred in admitting evidence. Specifically, they contend that the trial court erred in admitting evidence of (1) Weinberger's preparation for and subsequent flight; and (2) Gill's humiliation and anger when she learned about Weinberger's disappearance. We address each of their contentions in turn.

The standard of review for admissibility of evidence is abuse of discretion. *Blocher v. DeBartolo Properties Management Inc.*, 760 N.E.2d 229, 233 (Ind. Ct. App. 2001), *trans. denied*. The trial court abuses its discretion only when its action is clearly erroneous and against the logic and effect of the facts and circumstances before the court.

*Id.* Even if the trial court errs in its ruling on the admissibility of evidence, this Court will reverse only if the error is inconsistent with substantial justice. *Id.*

The Weinberger Entities first claim that the trial court erred in admitting evidence of Weinberger's preparation for and subsequent flight because there was no evidence that Weinberger's departure was related to any care or treatment rendered to Gill. We also addressed this same issue in *Boyer*. There, we noted that Boyer introduced evidence of Weinberger's behavior prior to his flight mainly through the testimony of Gadacz, his patient liaison. Specifically, Gadacz testified that a month before Weinberger disappeared, up to thirty to forty packages came into the office containing camping equipment. She also told the jury that six to eight visitors who did not speak English well met with Weinberger. In addition, she testified that banks were calling the office to inquire about unusual activity in Weinberger's accounts. We noted that through Gadacz's testimony, Boyer established that Weinberger was collecting the necessary cash and materials to flee the country, thereby abandoning Boyer.

We pointed out that we have previously held that a sudden trip can be characterized as flight and, although standing alone does not raise a presumption of guilt, it is competent to show consciousness of guilt. *Boyer*, 956 N.E.2d t 1114 (citing *Gash v. Kohm*, 476 N.E.2d 910, 915 (Ind. Ct. App. 1985), *trans. denied*. We also cited two other cases where we analogized a defendant's disposition of property to flight and allowed a similar inference of consciousness of guilt. *See Harrod v. Bisson*, 48 Ind.App. 549, 93 N.E. 1093 (1911) (evidence of physician transferring assets after a malpractice claim was

11

filed against him); *Myers v. Moore*, 3 Ind. App. 226, 28 N.E. 724 (1891). We therefore concluded that the testimony concerning Weinberger's odd behavior preceding his flight was relevant evidence because it established an inference of consciousness of guilt. *Boyer*, 956 N.E.2d at 1107. We found no error in the admission of this evidence. *Id.* at 1114.

Here, as in *Boyer*, Gadacz testified that Weinberger received thirty to forty packages with tents and camping equipment. She further testified about the arrival of the men who did not speak English well and the telephone calls from several banks confirming Weinberger's unusual activity and large ATM withdrawals. She also testified that medical malpractice lawsuits began arriving at the office, and Weinberger appeared very anxious. In addition, Weinberger's wife testified that after Weinberger disappeared, she realized that he had planned to disappear. Lastly, receiver Handler testified that there was a lot of camping equipment found in Weinberger's office and that he was able to recover a large FedEx package with more camping equipment that Weinberger sent to Paris. Here, as in *Boyer*, we conclude that the testimony concerning Weinberger's odd behavior and subsequent flight was relevant admissible evidence because it established an inference of consciousness of guilt.

Nevertheless, the Weinberger Entities contend that *Boyer* is factually distinguishable from this case because Boyer had additional treatment scheduled with Weinberger when Weinberger left the country. The Weinberger Entities allege that Gill's relationship with Weinberger ended on her last visit on April 7, 2004, and that any

actions on his part after that date are inadmissible. The Weinberger Entities further allege that in order for flight to be evidence of consciousness of guilt, it must be shown that the flight was caused by the incident at issue. According to the Weinberger Entities, there is no evidence that his flight was "in any way related to the medical treatment [Weinberger] rendered to [Gill]." Appellant's Br. at 13.

First, to the extent the Weinberger Entities argue that Weinberger no longer owed a duty to Gill because her last office visit was on April 7, 2004, they are mistaken. The Indiana Supreme Court has made clear that a physician's duty to a patient does not terminate upon the cessation of services if the physician is aware of the need for future care. *See Harris v. Raymond*, 715 N.E.2d 388 (Ind. 1999) (holding that a physician or oral surgeon who implants a medical device in a patient has a duty to warn both current and former patients of safety issues raised by the manufacturer and/or the FDA because in such a case, there is no bright line test for distinguishing between a current patient who perhaps has not seen the provider for quite some time and a former patient who has intentionally severed all ties with the provider). Here, Weinberger was aware that he put two unnecessary holes in Gill's sinuses and that she needed corrective surgery. Because Weinberger was aware of Gill's need for future care, his duty to her did not terminate on her last visit to his office in April 2004.

Further, our review of the evidence reveals that Gadacz testified that Weinberger seemed very anxious when medical malpractice lawsuits began arriving at the office. Specifically, the previously meticulous and clean-cut physician began walking around the

13

office partially clothed with stubble on his face. Weinberger's wife concluded that Weinberger disappeared because the lawsuits were threatening him. We agree with Gill that it is unlikely that any single lawsuit standing alone was the motivation for Weinberger's flight. Rather, his motivation was his knowledge that many medical malpractice claims had already been and would continue to be filed. Gill's claim was one of them. Under these circumstances, Gill, like Boyer, was permitted to use Weinberger's flight to establish consciousness of guilt.[1] The trial court did not err in admitting the evidence of Weinberger's flight into evidence.

The Weinberger Entities also allege that the trial court erred in allowing Gill to testify that she felt humiliated and angry when she learned that Weinberger had disappeared in the middle of the night. Specifically, the Weinberger Entities argue that the "trial court committed additional error by allowing Ms. Gill to argue and recover damages for her alleged emotional distress resulting from Dr. Weinberger's departure from the country because Indiana law precludes such a recovery in the absence of direct physical impact." Appellant's Br. p. 17.

The Weinberger Entities have waived appellate review of this issue because they failed to object to Gill's testimony at trial. *See Myers v. State*. 887 N.E.2d 170, 184 (Ind.

---

[1] In a single sentence at the end of their argument, the Weinberger Entities claim that the flight evidence "should have been excluded under Rule 403 of the Indiana Rules of Evidence as well." Appellant's Br. at 17. Because the Weinberger Entities deem these allegations only worthy of a single sentence and have not favored us with a cogent argument supported by legal authority and references to the record, their claims are waived for our review. *See Boyer*, 956 N.E.2d at 1108, n. 2 (citing Ind. Appellate Rule 46(A)(8)).

14

Ct. App. 2008), *trans. denied*, (stating that the failure to make a contemporaneous objection to the admission of evidence at trial results in waiver of the issue on appeal).

Affirmed.

ROBB, C.J., and MAY, J., concur.