## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Apr 17 2018, 7:49 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew P. Martin
Sachs & Hess, P.C.
St. John, Indiana

ATTORNEYS FOR APPELLEE

Karl L. Mulvaney
Nana Quay-Smith
Bingham Greenebaum Doll, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Donald Bunger,

*Appellant-Plaintiff,*

v.

Jason A. Brooks, M.D.,

*Appellee-Defendant.*

April 17, 2018

Court of Appeals Case No.
45A05-1709-CT-2165

Appeal from the
Lake Superior Court

The Honorable
John M. Sedia, Judge

Trial Court Cause No.
45D01-1201-CT-15

**Kirsch, Judge.**

[1] Donald Bunger ("Bunger") appeals the trial court's grant of judgment on the evidence in favor of Jason A. Brooks, M.D. ("Dr. Brooks") in Bunger's malpractice action against Dr. Brooks. Bunger raises the following restated

issue for our review: whether the trial court erred in granting Dr. Brooks's motion for judgment on the evidence because Bunger asserts that he presented sufficient evidence to make a prima facie showing of medical malpractice.

We affirm.

## Facts and Procedural History

At the time of his medical treatment with Dr. Brooks, Bunger was an eighty-eight-year-old man who had cataracts and age-related dry macular degeneration in both eyes. Both of these conditions are progressive and lead to a loss of visual acuity and eventual blindness. *Tr. Vol. 2* at 100, 165, 242; *Tr. Vol. 3* at 6-7. Vision loss caused by cataracts is often reversed by cataract surgery, but there is no cure for age-related dry macular degeneration. *Tr. Vol. 2* at 205, 241-42.

Macular degeneration presents in two forms: wet and dry. Wet macular degeneration involves a sudden leakage of fluid into the retina which can be halted by laser treatment. Dry macular degeneration typically presents as a slow-moving progressive disintegration of the macula at the back of the eye. *Id.* at 100-01, 223-25; *Tr. Vol. 3* at 4. Once the disease encroaches on the center part of the macula, which is called the fovea, significant loss of vision can occur "automatically." *Tr. Vol. 2* at 223-25. Macular degeneration progresses at an unpredictable rate, and a very small amount of progression so close to the center of the macula can cause a sudden drop in vision.

At all times relevant to this case, Bunger suffered from age-related dry macular degeneration, not wet macular degeneration.[1] Dr. Serge de Bustros ("Dr. de Bustros"), a retinal ophthalmologist, diagnosed Bunger with age-related macular degeneration in 2000 and continued to monitor and treat Bunger's condition over the following decade whenever Bunger was in Indiana.[2] Dr. de Bustros also diagnosed Bunger with cataracts in both eyes.

By 2009, Bunger's vision had deteriorated substantially due to the progression of both his macular degeneration and his cataracts. On June 17, 2009, Bunger went to see Dr. de Bustros complaining that he was having difficulty reading and that his vision was getting cloudy. After examining Bunger, Dr. de Bustros diagnosed Bunger with a 3+ cataract and determined that the vision in his right eye was 20/200 and the vision in his left eye was 20/60. At that same appointment, Dr. de Bustros also had pictures taken of the macula in Bunger's left eye, which showed that the area of degenerative damage was close to the center, or fovea, of Bunger's left eye, which made that eye "very close to legal blindness" due to the extent of the atrophy and damage. *Tr. Vol. 2* at 220.

Dr. de Bustros discussed with Bunger the option of surgery to remove the cataract from his left eye as it was the only option available to try to improve

---

[1] Bunger previously experienced one episode of wet macular degeneration. It was treated with a laser, and Bunger's condition returned to the dry form of the disease. *Tr. Vol. 2* at 213.

[2] Bunger spent his winters in Florida, where his macular degeneration was monitored by another retinal ophthalmologist.

Bunger's vision. *Id*. at 205, 207. Dr. de Bustros believed that removing Bunger's cataract would improve his visual clarity, reduce the haze in his vision, and improve the quality of the colors he saw. *Id*. at 205-06. Bunger's age and dry macular degeneration were not contraindications for cataract surgery. *Id*. at 206, 241. Because Dr. de Bustros does not perform cataract surgery, he referred Bunger to another ophthalmologist for consideration of the surgery. *Id*. at 206-07. When making such referrals, it is Dr. de Bustros's custom and practice to advise the patient of the risks of the surgery, including the risk of loss of vision. *Id*. at 207-08.

[8] Dr. de Bustros eventually referred Bunger to Dr. Brooks for consideration of cataract surgery and lens implantation, and on July 8, 2009, Bunger was seen for the first time by Dr. Brooks, a board-certified ophthalmologist. During Bunger's initial office visit, Dr. Brooks took his full medical history and examined his eyes. He determined that Bunger's left eye had a "3+ nuclear sclerotic cataract," which was cloudy and yellowish, and his visual acuity was 20/70. *Id*. at 7-8, 36. Dr. Brooks was aware that Bunger had no useful vision in his right eye because he had a large area of macular degeneration in the center of that eye. *Id*. at 11-12.

[9] Bunger told Dr. Brooks that he was having trouble reading in dimly-lit rooms, was seeing "glare," and he wanted to be able to drive a car. *Id*. at 10. Bunger said he wanted cataract surgery on his left eye so that he could see better. *Id*. at 12. Because Bunger's complaints about his vision were specific to the progression of his cataracts, and he had expressed interest in having cataract

surgery, Dr. Brooks concluded that cataract surgery was appropriate for him. *Id*. at 34. Dr. Brooks, like Dr. de Bustros, believed there was no contra-indication for surgery. *Id*. at 39.

[10] Dr. Brooks testified that he gave Bunger his standard informed consent speech, which included a description of what a cataract is, the surgery, the surgery's effectiveness rates, and its risks. *Id*. at 13. Dr. Brooks testified that he always tells his patients there are risks with this surgery and that any complications can lead to loss of vision or blindness. *Id*. at 14. Because Bunger had only one good eye, Dr. Brooks verified that Bunger understood he would be operating on his good eye and that the surgery created a risk of blindness or potential functional vision loss in the good eye. *Id*. Dr. Brooks would not have scheduled Bunger for surgery without Bunger's understanding of these facts. *Id*. at 15. Dr. Brooks's operative report documented that, "[a]fter discussing all the standard risks, benefits, and alternatives with the patient, he decided to proceed." *Id*. at 30. According to Dr. Brooks, these "standard risks" refer to the inherent risks of cataract surgery, including the risk of blindness. *Id*. After meeting with Bunger and having these discussions, Dr. Brooks scheduled surgery for July 16, 2009.

[11] On the day of surgery, as Bunger was being prepped for surgery, a nurse gave him a consent form, which he signed, in the presence of the nurse, who witnessed his signature. The form stated, in pertinent part:

> 2. I acknowledge that no guarantee has been given by anyone as to the results that may be obtained.

. . . .

> 10. Your signature below constitutes your acknowledgement (1) that you have read and agree to the foregoing; (2) that the operation or procedure set forth above has been adequately explained to you, including the risks and benefits and available alternative methods of treatment, by the above-named physician or surgeon; (3) that you authorize and consent to the performance of the operation or procedure; (4) that you authorize and consent to the administration of anesthesia for the said operative procedure.

*Ex. 6* at 32. Dr. Brooks testified that prior to surgery, he has his patients verify their name, why they are there, the surgical site, and that they signed the consent form; he also asks them if they have any questions and then signs the consent form in the patient's presence. *Tr. Vol. 2* at 17.

[12] Bunger could not recall signing any forms before surgery or meeting with Dr. Brooks before or after the surgery, but did not dispute the validity of his signature on the consent form. *Id*. at 69. Bunger "did not recall Dr. Brooks discussing with him any potential risks of surgery at their first meeting," only that the surgery would improve his vision. *Id*. at 62. Bunger recalled only that Dr. Brooks spent about ten minutes with him at that initial meeting, where he only explained the nature of the cataract surgery, not its risks or the potential for blindness in his left eye. *Id*. at 64-65. When he left Dr. Brooks's office, Bunger did "not really" realize that blindness in his left eye was a possibility, and that if he had any "inclination that anything would go wrong . . . [he] wouldn't have been in there." *Id*. at 66.

[13] On the morning of July 16, 2009, Bunger's eyesight was cloudy, and although he could still watch television "within reason," he could not distinguish between different cans of food. *Id*. at 68. During Bunger's cataract surgery on July 16, an unexpected but common complication occurred, a tear of the posterior capsule, which is the rear surface of the eye's "bag" or posterior chamber where Dr. Brooks places the artificial lens. *Id*. at 20. The tear was corrected by Dr. Brooks performing a vitrectomy, and this allowed Dr. Brooks to complete the surgery and successfully move the lens back into position, remove it, and insert the new artificial lens. A capsular tear in the posterior chamber of the eye is not an uncommon complication of cataract surgery, and its occurrence does not suggest there was a breach of the standard of care. *Id*. at 168-169. After the vitrectomy was performed, the surgery on Bunger's left eye was completed, and Bunger was sent home to rest with his eye bandaged.

[14] Dr. Brooks saw Bunger the day after surgery, and at that time, he removed the bandage on Bunger's left eye and replaced it with a shield to be worn for a week. At that time Bunger could not see the eye chart, but he could see Dr. Brooks waving his hand in front of his eye. Improvement in vision following cataract surgery varies with the individual, and there can be more postsurgical swelling of the cornea when the cataract surgery is complicated. Visual improvement may take anywhere from a few weeks to a few months. Dr. Brooks saw Bunger numerous times after his surgery to evaluate his vision and to check on the healing of his eye. Bunger's cornea healed successfully, but his visual acuity did not improve. Bunger's last appointment with Dr. Brooks was

on October 20, 2009, and at that time, the vision in his left eye was 20/200. *Id*. at 23.

[15] There are only two potential causes of Bunger's loss of vision: (1) the surgery, directly or indirectly; or (2) the unrelated progression of his macular degeneration. *Id*. at 44. No test exists that can confirm that Bunger's loss of vision was caused by the independent progression of his macular degeneration; that conclusion can only be reached by eliminating all other potential causes. *Id*. at 44-45. The practice of performing cataract surgery on patients with macular degeneration has been extensively studied, and the consensus of the medical community is that there is no relationship between the surgery and the progression of a patient's dry macular degeneration. *Id*. at 29, 210, 226. Cataract surgery does not affect macular degeneration because the lens and the macula are in separate parts of the eye. *Id*. at 28. Likewise, the capsular tear that occurred during Bunger's cataract surgery is "one of the more common complications" of that surgery and it "in and of itself does not cause loss of vision." *Id*. at 25.

[16] The only other possibility was that the capsular tear caused a secondary complication which then affected Bunger's vision. A capsular tear "does increase your risk for post-operative complications, things like macular edema . . . retinal detachment . . . hemorrhage or infection," which could have affected Bunger's vision. *Id*. Dr. Brooks looked for these things, which were all ruled out because Bunger "did not have any of those things." *Id*. Because those potential complications were ruled out, Dr. Brooks concluded that Bunger's

loss of vision must have resulted from the independent progression of his macular degeneration. *Id.*

[17] On August 6, 2009, Bunger saw Dr. de Bustros's partner, Dr. Kourous Rezaei ("Dr. Rezaei"), for a follow-up retinal consultation, and Dr. Rezaei determined that Bunger's dry macular degeneration had progressed and that he had temporary swelling in the cornea, which is in the front of the eye. *Id.* at 226; *Ex. 4* at 43. During this appointment, Dr. Rezaei performed an OCT test, "which did not indicate any macular edema." *Ex. 4* at 43, 53. Dr. Rezaei concluded that Bunger's reduced vision was most likely due to corneal changes. *Id.* at 43.

[18] Dr. de Bustros saw Bunger on September 2, 2009 to evaluate his vision. Dr. de Bustros took Bunger's medical history, conducted an eye exam, and performed various tests, including a fluorescein angiogram and another OCT. *Tr. Vol. 2* at 209-10; *Ex. 4* at 51. Those tests revealed no thickening in Bunger's macula, no macular hemorrhage, and no leakage of fluid in his left eye. *Ex. 4* at 51. Dr. de Bustros recognized that Bunger's corneal swelling was a temporary condition that would improve over a few months and was unlikely to cause any long-term damage or vision loss. *Tr. Vol. 2* at 226-27. Dr. de Bustros concluded that the "most logical cause" of Bunger's loss of vision was the independent progression of his macular degeneration and delayed corneal healing after cataract surgery.

*Id.* at 210.[3]  This conclusion was consistent with the November 2009 report Dr. de Bustros received from Bunger's doctor in Florida, who examined Bunger and found a new area of macular degeneration in the left eye.  *Id.* at 222-23.

[19]  On June 8, 2010, Bunger filed a proposed complaint for medical malpractice against Dr. Brooks with the Indiana Department of Insurance.  The proposed complaint alleged that Dr. Brooks improperly performed Bunger's cataract surgery, failed to assess Bunger's medical condition, failed to properly assess the risks of cataract surgery, and failed to inform Bunger of the surgery's material risks.  The medical review panel issued a unanimous opinion, which determined that the evidence did not support the conclusion that Dr. Brooks's surgery and treatment of Bunger failed to meet the applicable standard of care as alleged in the complaint.  The panel also determined there was a material issue of fact on liability regarding the issue of informed consent.

[20]  Bunger subsequently filed his complaint in Lake Superior Court, and he again asserted that Dr. Brooks failed to properly assess his medical condition or the risks of cataract surgery and failed to inform him of the material risks of surgery.  However, he no longer claimed that Dr. Brooks's surgery or treatment fell below the standard of care.  Bunger produced one expert witness, Dr. Harry Knopf ("Dr. Knopf"), a retired ophthalmologist and professor of clinical

---

[3] Slower corneal healing is expected in patients who undergo a vitrectomy.  *Tr. Vol. 2* at 118.  Dr. de Bustros last saw Bunger on September 2, 2009, which was well within the one to two-month period that Bunger's corneal healing was expected to take.  *Id.* at 118, 219.

ophthalmology at Washington University in St. Louis medical school, to testify in support of his lack of informed consent claim. After deposing Dr. Knopf on December 4, 2012, Dr. Brooks moved for summary judgment on the basis there was no genuine issue of material fact regarding causation. In response to Dr. Brooks's motion for summary judgment, Bunger submitted an affidavit of Dr. Knopf, which stated he believed that the cataract surgery to Bunger's left eye and subsequent complication was the proximate cause of his sudden and acute blindness. Dr. Brooks moved to strike Dr. Knopf's affidavit as being contradictory to Dr. Knopf's deposition testimony. The trial court agreed, struck the affidavit, and granted summary judgment to Dr. Brooks, finding that Dr. Knopf's averments in his affidavit were inconsistent with his deposition testimony.

[21]     Bunger appealed the summary judgment order to this court in *Bunger v. Brooks*, 12 N.E.3d 275 (Ind. Ct. App. 2014) ("Bunger I"). This court reversed, holding that the trial court had abused its discretion in striking Dr. Knopf's affidavit because it was not inconsistent with his deposition testimony. *Bunger I*, 12 N.E.2d at 281. This court also reversed the trial court's grant of summary judgment, concluding that Dr. Knopf's deposition testimony and affidavit constituted evidence sufficient to create a genuine issue of material fact and remanded the case for trial. *Id*. at 284.

[22]     After the case was remanded to the trial court, Dr. Knopf gave a new videotaped evidentiary deposition on June 13, 2017 in preparation for trial. During his second deposition, Dr. Knopf opined that macular swelling from

complications that occurred during Bunger's cataract surgery caused his loss of vision, either by inflaming the retina, or accelerating the progression of his preexisting macular degeneration.

[23]    A jury trial commenced on August 21, 2017. Dr. Knopf's videotape deposition of June 13, 2017 was the sole expert testimony Bunger presented in support of his lack of informed consent claim. Dr. Knopf acknowledged that Dr. Brooks's surgery on Bunger was done correctly and that the complication of the posterior capsular tear was handled "very well." *Tr. Vol. 2* at 116-17. Dr. Knopf testified that he believed that Dr. Brooks's informed consent and disclosure of the risks to Bunger was inadequate because Bunger had monocular vision and Dr. Brooks did not "really . . . make [Bunger] understand what the possible ramifications of a complicated surgery would be" and should have warned him about the implications of functional blindness since Bunger had no vision in his right eye. *Id.* at 120-22, 155-56.

[24]    When Dr. Knopf was asked about the cause of Bunger's loss of vision, he admitted that Bunger did not suffer any hemorrhage or infection in his left eye as a result of the surgery and agreed that Bunger's macular degeneration had not been active (wet) for several years, and as long as it was not active, there was no contraindication for cataract surgery. *Id.* at 125-26, 152-53. Dr. Knopf also agreed that a patient who suffers from macular degeneration is not at any greater risk of vision loss from a routine cataract surgery than one who does not. *Id.* at 154.

On direct examination, Dr. Knopf testified that, in his opinion, Bunger's vision loss was caused because "the surgical complication of posterior capsular rupture with vitreous loss produced enough inflammation that the retinal tissue was compromised and that never recovered . . . ." *Id.* at 118. On cross-examination, Dr. Knopf explained his opinions and the reasons for reaching them:

> Q. Okay. And now, today, I believe you testified that you believe that . . . the deterioration of the visual acuity post-cataract surgery was due to inflammation of the retina as a result of the vitreous loss and vitrectomy?

> A. Correct. I'm saying -- we're saying the same thing, though.

> A. Are all those three things the same thing?

> A. Yeah. If you -- you have two problems when you have vitrectomy. Postoperatively you get macular edema. And I believe if you look at the post-operative notes where the OCT was done on [Bunger], he actually did have some edema of the retina. And in fact, routine patients often get edema after they have vitrectomy, but then they recover and the edema goes away and the patient's vision improves. But also the underlying retina, the neovascular membranes and the exudate that occurs under a retina when you have hemorrhagic macular degeneration or you have wet macular degeneration can be aggravated by inflammation. And when you do a vitrectomy, you get inflammation as well which then can aggravate the underlying retina.

> Q. Okay. What studies would allow you to determine if there was aggravation of the macular degeneration?

A. . . . a fluorescein angiogram after surgery, or again, OCT would help if you could see that the retina was intact over the macular area. But the fluorescein would probably be the best way to tell.

Q. Fluorescein would be the best way to tell if there was progression of the macular degeneration?

A. Yeah, yes, because it would show where leakage is if there was more leakage.

*Id*. at 157-58.

[26] Dr. Knopf believed that macular edema from Bunger's surgical complication could have caused his vision loss by either aggravating Bunger's wet macular degeneration or causing inflammation that affected the retina. *Id*. Dr. Knopf testified that it could be determined whether macular edema from the surgical complication had aggravated Bunger's macular degeneration by a fluorescein angiogram, but Dr. Knopf could not confirm that possibility because he had not reviewed any of Bunger's fluorescein angiogram tests. *Id*. at 158. Dr. Knopf also confirmed that an OCT test would show whether there was swelling in Bunger's retina post-surgery, and he believed that an OCT test in Dr. de Bustros's medical records had shown transient swelling of Bunger's retina. *Id*. at 160-61. However, after reviewing Dr. de Bustros's records, Dr. Knopf admitted that he did not find the documentation that he thought had existed demonstrating swelling of Bunger's retina. *Id*. at 161.

[27] Dr. Knopf reviewed the OCT test that was performed by Dr. Rezaei, on August 6, 2009 and the OCT test administered by Dr. de Bustros on September 2, 2009. He also examined the letter from Dr. Rezaei that summarized the results of the August 6 OCT test which confirmed that there was no sign of macular edema. *Id.* at 162-63. Dr. Knopf agreed that if there were swelling of the macula or the retina as a result of the vitrectomy, you would expect swelling to be evident within a month of the surgery on the OCT. *Id.* at 163. Dr. Knopf then agreed that macular or retinal swelling was not present one month post-operation. *Id.* at 163-64.

> Q. You would expect -- if there were swelling of the macula or the retina as a result of the vitrectomy that needed to be performed because of the complication, you would expect that to be evident within a month on the OCT --
>
> A. I would.
>
> Q. -- Is that correct? And that was not present -- ?
>
> A. Correct.
>
> Q. -- One month post-op --
>
> A. Correct.

*Id.* Dr. Knopf was then asked:

> Q. . . . But with regard to the two potential causes with the deterioration of the vision that you've discussed . . . there's no

documented evidence of either. Is that fair to say? I know that you believe that the loss in vision --

A. Yes.

Q. -- is evidence of that fact, but there's no objective testing that supports either one of those two potential causes?

A. Correct, there's no acute hemorrhage that was seen, and . . . there is no sign at this point that there's anything active going on.

Q. So there's no sign of -- on testing of progression or that you could find on progression of his . . . macular degeneration, nor is there any testing that supports any retinal swelling?

A. Correct.

*Id.* at 164-65. Dr. Knopf agreed that he did not know what Bunger's vision would have been in 2010 if he had not had cataract surgery because the progression of either his macular degeneration or his cataracts could have remained the same or could have accelerated. *Id.* at 166-67.

[28] At the end of Bunger's case in chief, Dr. Brooks moved for judgment on the evidence because Dr. Knopf's opinion was without factual foundation and therefore speculative. *Id.* at 176. Dr. Brooks argued that Dr. Knopf's causation opinion depended on his unsupportable assumption that Bunger's loss of vision was caused by retinal swelling from the cataract surgery, but Dr. Knopf had already admitted that Bunger had not experienced any post-surgical retinal swelling, as demonstrated by his medical records and post-surgical testing. *Id.*

at 176; *Appellee's App. Vol. 2* at 81-85. The trial court denied the motion for judgment on the evidence at that time, and Dr. Brooks proceeded to present his case-in-chief.

[29] During his case-in-chief, Dr. Brooks presented the testimony of two experts, Dr. Joseph Garber ("Dr. Garber"), an ophthalmologist who performs cataract surgeries, and Dr. Jack Cohen ("Dr. Cohen"), a retinologist who specializes in retinal and vitreous diseases of the eye. In his testimony, Dr. Garber confirmed that cataract surgery does not increase the risk of progression in patients with dry macular degeneration and opined that Bunger's decrease in vision was related to the progression of his macular degeneration which happened independently of his cataract surgery. *Tr. Vol. 2* at 239, 247. Dr. Cohen testified that dry macular degeneration is not affected by cataract surgery because the lens, which is what is affected by a cataract, and the macula are not in the same area of the eye. *Tr. Vol. 3* at 8. Dr. Cohen also gave his opinion that Bunger's surgical complication had no bearing on his vision loss and did not cause any retinal detachment, glaucoma, or macular edema; he also opined that Bunger's dry macular degeneration did not change to wet macular degeneration. *Id.* at 14, 15-16, 21. Dr. Cohen explained that the OCT test performed after Bunger's surgery looked at changes in his macula, and this "objective" testing did not find any macular edema, and it was Dr. Cohen's opinion that "there is no direct evidence on any examination or objective testing that there was a complication from cataract surgery that directly created vision loss." *Id.* at 20, 31.

[30] At the conclusion of all of the evidence, Dr. Brooks renewed his motion for judgment on the evidence. The trial court granted the motion, focusing on the fact that Dr. Knopf's causation opinion rested on the assumption that swelling had occurred, but he had acknowledged that Bunger's OCT test results revealed no retinal swelling. *Id*. at 41-59. The trial court concluded there was nothing for the jury to weigh, because Dr. Knopf had based his opinion on something that he conceded did not happen. *Id*. at 59. After granting the motion for judgment on the evidence, the trial court released the jury and entered judgment in favor of Dr. Brooks. Bunger now appeals.

## Discussion and Decision

[31] The standard of review for a challenge to a ruling on a motion for judgment on the evidence is the same as the standard governing the trial court in making its decision. *Weinberger v. Gill*, 983 N.E.2d 1158, 1162 (Ind. Ct. App. 2013). Judgment on the evidence is proper only where all or some of the issues are not supported by sufficient evidence. *Id.* The court looks only to the evidence and the reasonable inferences drawn most favorable to the nonmoving party, and the motion should be granted only where there is no substantial evidence supporting an essential issue in the case. *Id.*

[32] The determination of whether the evidence is sufficient to support a party's contentions requires both a quantitative and a qualitative analysis. *Purcell v. Old Nat'l Bank*, 972 N.E.2d 835, 840 (Ind. 2012) (citing *Am. Optical Co. v. Weidenhamer,* 457 N.E.2d 181, 184 (Ind. 1983)). "Evidence fails quantitatively

only if it is wholly absent; that is, only if there is no evidence to support the conclusion." *Id.* "If some evidence exists, a court must then proceed to the qualitative analysis to determine whether the evidence is substantial enough to support a reasonable inference in favor of the non-moving party." *Id.* Evidence fails qualitatively "'when it cannot be said, with reason, that the intended inference may logically be drawn therefrom; and this may occur either because of an absence of a witness or because the intended inference may not be drawn therefrom without undue speculation.'" *Id.* (quoting *Am. Optical*, 457 N.E.2d at 184). In other words, "'[i]f there is evidence that would allow reasonable people to differ as to the result, judgment on the evidence is improper.'" *Best Formed Plastics, LLC v. Shoun*, 51 N.E.3d 345, 351 (Ind. Ct. App. 2016) (quoting *Smith v. Baxter*, 796 N.E.2d 242, 243 (Ind. 2003)), *trans. denied*.

[33] Bunger argues that the trial court erred when it granted Dr. Brooks's motion for judgment on the evidence. Bunger contends that he presented sufficient expert medical evidence, through the testimony of Dr. Knopf, to make a prima facie showing of medical malpractice. Bunger asserts that Dr. Knopf's testimony was sufficient to establish that the proximate causation of Bunger's sudden loss of vision in his left eye was the complication from the cataract surgery performed by Dr. Brooks, which resulted in retinal swelling and caused his blindness. Bunger maintains that this was sufficient evidence of proximate causation, and the trial court erred in granting the motion for judgment on the evidence because there was sufficient evidence to allow the jury to decide the issue.

[34] To establish a prima facie case of medical malpractice, a plaintiff must demonstrate: (1) a duty on the part of the defendant in relation to the plaintiff; (2) a failure to conform her conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure. *Sorrells v. Reid-Renner*, 49 N.E.3d 647, 651 (Ind. Ct. App. 2016) (citing *Thomson v. St. Joseph Reg'l Med. Ctr.*, 26 N.E.3d 89, 93 (Ind. Ct. App. 2015)). Indeed, the plaintiff must come forth with expert medical testimony establishing: (1) that the doctor owed a duty to the plaintiff; (2) that the doctor breached that duty; and (3) that the doctor's breach proximately caused the plaintiff's injuries. *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016); *Sorrells*, 49 N.E.3d at 647. Under Indiana law, the evidentiary standard required to establish the fact of causation is by a preponderance of the evidence. *Id*. "Generally, '[p]roximate cause involves two inquiries: (1) whether the injury would not have occurred but for the defendant's negligence; and (2) whether the plaintiff's injury was reasonably foreseeable as the natural and probable consequence of the act or omission.'" *Laycock v. Sliwkowski*, 12 N.E.3d 986, 991 (Ind. Ct. App. 2014) (quoting *Nasser v. St. Vincent Hosp. & Health Servs.,* 926 N.E.2d 43, 48 (Ind. Ct. App. 2010), *trans. denied*), *trans. denied*. A plaintiff's burden of proof may not be carried with evidence based upon mere supposition or speculation. *Roberson v. Hicks*, 694 N.E.2d 1161, 1163 (Ind. Ct. App. 1998), *trans. denied*. Speculation will not pass for an expert opinion under Indiana Evidence Rule 702. *Chaffins v. Kauffman*, 995 N.E.2d 707, 712 (Ind. Ct. App. 2013) (citing *Clark v. Sporre,* 777 N.E.2d 1166, 1170 (Ind. Ct. App. 2002)), *trans. denied*. Although proximate cause is generally a question of fact, it becomes a

question of law where only a single conclusion can be drawn from the designated evidence. *Carey v. Ind. Physical Therapy, Inc.,* 926 N.E.2d 1126, 1129 (Ind. Ct. App. 2010), *trans. denied.*

[35] In the present case, Bunger alleged that he was not properly informed by Dr. Brooks about all of the potential risks of the cataract surgery, including blindness to his left eye, prior to agreeing to have the surgery. He contended that, had he been properly advised of all of the potential risks, he would not have gone forward with the surgery, and therefore would not have lost his vision in his left eye. To submit this claim to the jury, Bunger was obligated to introduce testimony by a medical expert to establish that Dr. Brooks's alleged breach of the standard of care -- the failure to obtain Bunger's informed consent to surgery – proximately caused Bunger's post-operative loss of vision.

[36] We conclude that Bunger failed to meet his burden of establishing proof of causation. At trial, Bunger only presented the testimony of Dr. Knopf to support his claim of medical malpractice against Dr. Brooks. Dr. Knopf's testimony on cross-examination showed that, although he claimed that the cataract surgery performed by Dr. Brooks caused Bunger's loss of vision, his theory of causation was based on facts that were contradicted by the undisputed medical test results. On cross-examination, Dr. Knopf admitted that, although they were inherent risks of cataract surgery, Bunger did not suffer any hemorrhage or eye infection as a result of the surgery and that Bunger's macular degeneration had not been active (wet) for several years so there was no contraindication for cataract surgery. *Tr. Vol. 2* at 125-26, 152-153. Dr.

Knopf also acknowledged that patients with macular degeneration benefit from cataract surgery and that they have no greater risk of vision loss from routine cataract surgery. *Id*. at 154.

[37] Dr. Knopf's causation theories relied on the presumption that Bunger's loss of vitreous and the need for the vitrectomy had caused macular edema which had inflamed his retina or aggravated his macular degeneration. *Id*. at 156-57. When asked what studies or tests would allow him to determine if there had been an aggravation of the macular degeneration, Dr. Knopf replied that a fluorescein angiogram was the best way because it would show leakage if any was present. *Id*. at 158. Dr. Knopf initially admitted that he could not confirm if the vitrectomy had aggravated Bunger's macular degeneration because he had not reviewed the tests, and after reviewing Bunger's medical records, Dr. Knopf acknowledged that the fluorescein angiogram showed no aggravation of Bunger's macular degeneration had occurred. *Id*. at 160-61.

[38] As to the theory that the surgery resulted in swelling of Bunger's retina or macular, Dr. Knopf testified that an OCT test would show whether any swelling occurred. He initially stated his belief that test results in Bunger's medical records showed transient swelling of the retina, but after reviewing the medical records, Dr. Knopf admitted that there was no evidence of swelling of Bunger's retina. *Id*. at 161. After reviewing the OCT test performed by Dr. Rezaei on August 6, 2009, his letter summarizing the results, and the OCT done by Dr. de Bustros on September 2, Dr. Knopf admitted that this objective testing showed no sign of macular edema. *Id*. at 163. Furthermore, Dr. Knopf

agreed that if there had been swelling of the macular or the retina as a result of the vitrectomy, that swelling would be evident in the OCT results within a month of the surgery. *Id*. at 163-64. Based on this, Dr. Knopf then agreed that Bunger had not experienced retinal or macular swelling, and he admitted that there was no documented medical evidence supporting either of his two causation theories. *Id*. at 163-65. Dr. Knopf ultimately agreed that he did not know what Bunger's vision would have been in 2010 had he not had cataract surgery, because his macular degeneration or his cataracts could have accelerated, resulting in vision loss. *Id*. at 166-67.

[39] Dr. Knopf's opinion on the causation of Bunger's loss of vision was unsupported by, and contrary to, Bunger's post-surgical test results. Dr. Knopf admitted that there was no evidence Bunger experienced any aggravation of his macular degeneration, and Bunger's OCT tests showed he had no swelling or inflammation of his retina. It was also shown that Dr. Knopf gave his causation opinion on direct examination without any knowledge of Bunger's actual medical history, so Dr. Knopf did not have a basis upon which to render his opinion. *Chaffins*, 995 N.E.2d at 712. Therefore, Dr. Knopf's opinion was based on facts that were not proven and shown not to exist, and consequently, there was no substantial evidence supporting the essential issue of causation in

the present case. *Weinberger*, 983 N.E.2d at 1162. We conclude that the trial court properly granted Dr. Brooks's motion for judgment on the evidence.[4]

[40] Affirmed.

[41] Bailey, J., and Pyle, J., concur.

---

[4] In arguing that the trial court erred, Bunger relies on *O'Banion v. Ford Motor Co.*, 43 N.E.3d 635 (Ind. Ct. App. 2015), *trans. denied*, where this court found an engineer's scientific opinion to be admissible because he had "examined the evidence in great detail" and did not "make bald assertions based on no evidence." *Id.* at 644. Bunger's reliance is misplaced because in the present case Dr. Knopf's opinion on causation was shown to not be based on any proven facts and to be contrary to the undisputed medical evidence.